AMY H. DU PUY and HERBERT DU PUY *vs.* THE TRANSPORTATION AND TERMINAL COMPANY OF BALTIMORE CITY and Others.

*Corporations—False Statements in Prospectus—Fraudulent Acts of Directors—Winding Up Corporation—Assignment for Benefit of Creditors—Rights of Stockholders—Receivers.*

The promoters of a corporation by misrepresentations as to its assets and income and as to the names of its directors induced plaintiffs to buy shares of stock, the purchasers being led to believe that they were buying from the company. The directors soon afterwards passed a resolution directing the affairs of the corporation to be wound up, and in pursuance thereof an assignment for the benefit of creditors was executed. The trustee under the assignment released the chief promoter from his obligation to transfer certain valuable property to the company in consideration of the latter's releasing the company from its obligation to issue shares of stock subscribed for by him. The company was not apparently insolvent, and the trustee reported to the Court a fictitious sale of the remaining assets, which was ratified. Upon a bill by plaintiffs, as stockholders, for a cancellation of the assignment and the appointment of a receiver, *Held,*

1st. That if the real object of the deed of trust was to wind up the affairs of the corporation under the pretext of paying its creditors, then the proceeding was illegal, because a corporation can only be wound up in the manner prescribed by the Code.

2nd. That if the deed of trust was such as a corporation in failing circumstances may lawfully make, then its validity depends upon the good faith of both grantor and grantee, and if the trustee was implicated in the fraudulent purpose of the grantor, then the deed, although regular on its face, is void.

3rd. That the deed of trust in this case was void, its real purpose being to strip the corporation of its assets for the benefit of the promoters, and that the sale made by the trustee was a sham.

4th. That a receiver should be appointed to recover the assets of the corporation.

When the acts of the officers of a corporation are fraudulent, illegal or *ultra vires*, any stockholder is entitled to ask for the protection of a Court of Equity.

Appeal from a decree of the Circuit Court of Baltimore City (Dennis, J.), dismissing the bill of complaint in this

case. The facts appear in the opinion of the Court. The defendants were the Transportation and Terminal Company, W. Gilmor, president, and in his own right, The Maryland Central Ry. Co., The Maryland Construction Company, John Henry Miller, Samuel Rea, W. J. Taylor, and The Penn Anthracite Coal Co. After asking that the assignment for the benefit of creditors, executed by the Terminal Company, be set aside, the bill set forth that "in order that said property in the meantime may be protected from spoliation by the persons who now unlawfully hold the same, and that the rights of the real owners, including your orators, may be protected; they claim that they are entitled to an injunction prohibiting and enjoining the said Maryland Central Railway Company and the said Deer Creek and Susquehanna Railroad Company, and the said Maryland Construction Company of Baltimore City, and the Penn Anthracite Coal Company, from suffering or permitting any one to have or exercise any control over the stock of each of said companies to which the said Transportation and Terminal Company of Baltimore City is, or was at any time entitled, or from suffering or permitting anyone to receive or take any profit or benefit whatever, to which the ownership of said stock may in anyway entitle the lawful owners thereof, until the further order of this Court, and enjoining and restraining the said Winfield J. Taylor, assignee, from parting with any property of said Transportation and Terminal Company of Baltimore City, which may have come to his hands under said deed to him from said company, or from withholding the same from the receiver to be appointed by this Court in this case, and from further pretending to act under said deed until the further order of this Court, and enjoining and restraining the said John Henry Miller from parting with, except to the receiver appointed in this case, any property of said Transportation and Terminal Company of Baltimore City, that said Miller may have received, and from attempting to convey any property now held by him in his own name, be-

longing to said company, or purchased with the means of said company, until the further order of this Court; and enjoining and restraining the said Transportation and Terminal Company, its officers, servants and agents, from withholding any of the property from the receiver to be appointed in this case, and also requiring the said William Gilmor, John Henry Miller and Samuel Rea and all other persons having in their possession or under their control, any money or property of said Transportation and Terminal Company of Baltimore City, or the proceeds of any such property, to account to said receiver for the same, and to pay, assign, transfer and deliver any such property to said receiver."

The cause was argued before ROBINSON, C. J., BRYAN, McSHERRY, FOWLER, BRISCOE, PAGE and BOYD, JJ.

*Charles Marshall* and *Edgar H. Gans,* for the appellants.

The main question in the case is the validity of the deed of trust; for if that is a valid instrument, then assets which before the time of the deed had been fraudulently appropriated, would belong officially to the trustee, who would have power to recover the same, and the Court would be more reluctant to appoint a receiver.

The complainant alleges that the deed was void: First. In law, as it was a deed that directors of a corporation had no power to authorize or make.    Second. In fact, because it was part and parcel of a contrivance to defraud the plaintiff and other *bona fide* stockholders of the company.

There is no dispute about the principles of law in this case; the difficulty is only in their application.    It is well settled that directors of a corporation may make an assignment of all its property for the payment of its creditors when it is insolvent, provided they act in good faith with a due regard to the interest of the shareholders.    It is, however, equally well established that the " directors of a company have no implied authority to wind up the company or to

sell any property which is necessary to carry on its business. Directors are merely agents, and they are appointed for the purpose of managing the business in which the shareholders have agreed to unite ; the value of this business as a commercial speculation and the advisability of continuing it, are matters which concern those who have embarked in it, and not their managing agents." 1 *Morawetz*, section 513.

The complainant contends that the directors of the Transportation and Terminal Company decided, without any authority, to wind up the affairs of the company, not because it was insolvent, and not because it was obliged to make provision for the payment of its debts.   What is the real fact?   If the directors took this action merely to wind the company up, then the deed is void.   If they made the deed because it was necessary to provide for creditors, and it was made *bona fide*, then the deed is good and valid.   The complainant contends that the payment of creditors had nothing to do with the action of the directors ; that there were no creditors of the company, except those who formed and were intended to form some of its constituent parts ; that those creditors were not pressing, and that there was property and credit enough to provide for them even had they been pressing.   The real reason was that the managers of the corporation and their confederates had used the corporation in furtherance of their schemes as long as it served their purposes, and now they wanted to cast it aside when it suited their purposes better, and to do this they were obliged to *wind it up.*

After having made money by the sale of this preferred stock, all of said sales (if they were at all like the sales made to Lindenthal), based upon the alleged ownership by the Transportation and Terminal Company as a pooling company of the majority of stock in the various enterprises mentioned, the company immediately begins to disintegrate, and the first evidence of disintegration is found in the minutes of the directors of the meeting held on the 16th of August, 1890.   The president of the corporation himself

seems to have made the astonishing request that Miller, who had bound himself by contract to turn over a very valuable asset to the corporation (a majority of the shares of stock of the Penn Anthracite Coal Company, the company which formed the very keystone of the arch, without which the whole scheme for which the Transportation and Terminal Co. was formed, would have fallen to pieces), should make application to be relieved from this obligation.    All that the company had to do to get this valuable asset was to issue its common stock.   It was not obliged to pay anything, and every stockholder was interested, particularly the preferred stockholders were interested, in having the contract carried out; because, although if the contract had been carried out, the common stockholders would have had their interest in the corporate assets reduced one-half by reason of the new issue of 66,500 shares of stock, yet, even as to them, a one-half interest in assets, increased by ths shares of the Penn Anthracite Coal Company, would be very much more valuable than the interest which they then had in the assets of the corporation.   As to the preferred stockholders they would have had a paramount claim on the assets of the corporation.

This action of the board of directors was a fraud and simply void and of no effect.   A board of directors has no right to release a stockholder from his subscriptions to the capital stock as against a preferred stockholder, who, in the State of Maryland, stands very much in the relation of a creditor, and particularly has no right to grant a release when the doing of that act amounts to changing the whole scope and purpose of the corporation itself.   The fact is, that Miller got into a personal snarl with respect to this 19,950 shares of the capital stock of the Penn Anthracite Co., which prevented him from delivering it to the corporation, but he settled that difficulty to his own satisfaction and for his own personal benefit.   This meeting was on the 16th of August, 1890.   The Court can then readily understand that at the very next meeting of the board of direc-

DU PUY *vs.* TERMINAL COMPANY.     413

tors, held on November 8, 1890, the president of the cor-
poration stated that, as the purposes for which the company
was originally formed have been in some respects mater-
ially changed, some plan of winding up the affairs of the
company should be devised.

The method of disposing of the property of company
by the trustee shows conclusively that the winding up con-
templated by the deed had been previously arranged between
all the parties concerned, and this winding up was carried
on by the perpetration of a fraud by the trustee upon the
Circuit Court, to the knowledge of the parties interested in
the Transportation and Terminal Company, other than the
*bona fide* stockholders.   The Court will recollect that the
active control of the Transportation and Terminal Com-
pany was in the hands of Miller, Gilmor and Houseman.
They are the parties who practically dictated all its work.
They are the parties, undoubtedly, who arranged for the
making of this deed, and no one can read the evidence as
to what was done under the deed without being convinced
that the whole matter was a scheme to vest the assets be-
longing to the company in the hands of these various peo-
ple by going through the forms of law.

The company had then in possession 2,100 shares of the
capital stock of the Maryland Central Railroad Company
and 4,000 shares of the capital stock of the Deer Creek
and Susquehanna Railroad Company.   Of course, Miller
wanted to get possession of this stock.   Therefore, he makes
an arrangement by which he will give to the trustee 11,000
shares of the first preferred stock of the Transportation and
Terminal Company of Baltimore City, and won't require
the company to issue to him any more common stock, pro-
vided the trustee will give him these assets, to-wit, 2,100
shares of the Maryland Central stock and 4,000 shares of
the capital stock of the Deer Creek and Susquehanna R.
R. Co.   We suggest to the Court at this point the humor
of the situation.   As Miller and Gilmor now contend, the
corporation was then insolvent.   It was in the hands of a

trustee appointed for the benefit of creditors.    It was not
being wound up for any other reason, they say, but was in
process of having its assets sold as an insolvent corporation
for the benefit of creditors; and yet he is offering here to
return preferred stock of the company, which, on his own
confession, was not worth a cent, and releasing the corpora-
tion from issuing common stock to him, which the corpora-
tion could issue without costing it a cent, and for the doing
of that, which amounted to nothing at all, he was to get
the 2,100 shares of the Maryland Central Ry. Co. stock
and the 4,000 shares of the Deer Creek and Susquehanna
R. R. Co.    The trustee, in dealing with this transaction,
does not state it to the Court as a sale of those assets for
value.    He does not state it to the Court as a transaction
done by the trustee realizing on the assets for the benefit of
creditors, but states the matter as being one of the steps
which he deems advisable in the winding up of the affairs
of the corporation, for he states that the preferred stock
would be decreased to the extent of 11,000 shares, and this
goes very far towards an equitable winding up of the affairs
of the corporation.

Further, to show the fraud in this matter, the Court will
see from the auditor's report that the claims filed against
the corporation amounted in the whole to $31,473.39, of
which $15,244.68 was a claim by M. H. Houseman, the
counsel of the company, and $15,403.71 claimed by the
Maryland Central Ry. Co., really a constituent part of the
Transportation and Terminal Company, and $825, a claim
by Winfield J. Taylor, so that the claims filed were really
less by some $4,000 than the amount pretended to have
been realized in cash by the sale to Blick, which of itself
would show, even if these claims filed were *bona fide*, that
the corporation was not insolvent.

It is evident that neither Du Puy nor his agent, Linden-
thal, through whom the contract was made, ever had a
suggestion that the actual contract was a purchase of stock
from Miller, the proceeds of which purchase were to go into

Miller's pocket and not enure to the benefit of the company. In other words, it is plain that the attempt to convert the contract between Du Puy and the company evidenced by the receipts signed by the president of the company, is an attempt to change the contract made by Du Puy, and consented to by Du Puy, into another and very different contract, having a different effect altogether.   He was asked to buy company's stock in order to furnish the company with money for its purposes.   When the time for performance came he paid his money, and unknown to him and without notice to him, an attempt is made to let Miller step in and get the benefit of the contract, as if the contract had been one between him and Du Puy.   The result of which is that the money paid by Du Puy, instead of going to the purposes of the company and giving value to his stock, is diverted into the pocket of Miller and his associates.   The case of *Bolton* against *Jones*, 2 H. and N. 264, and the case of *Cundy* v. *Lindsay*, Law Reports, 3 App. cases 465, clearly establish that such a thing cannot be done so as to bind Du Puy, if any authority were necessary for so plain a proposition.   The certificates of stock were delivered in strict accordance with the terms of the contract, in strict accordance with the original proposition to Du Puy that he should take the stock of the company and pay for it in such a way that the company would get his money for the purchase of rights of way and other corporate purposes designed to add to the value of the stock.   To allow the money so paid by Du Puy to be taken and put into Miller's pocket, because it is alleged that the stock actually delivered to Du Puy belonged to Miller, would be to sanction the entire defeat of the contract.   Du Puy had the right as a stockholder, and through him every other stockholder has the right, to require that the money paid by him should be treated as the money of the corporation.

The receiver has an undoubted right to start proceedings and get the 19,950 shares of stock of the Penn Anthracite Co., which Miller was bound by his contract to furnish and

from which the board of directors illegally and unlawfully attempted to release it, as we have already shown. The receiver has a right to get back the 2100 shares of the Maryland Central Ry. Co. stock and the Deer Creek and Susquehanna R. R. Co. stock, which was given away by the trustee. There is real estate sold to Blick, and now in the hands of persons who have notice of its original invalidity, and this real estate can be sold by the receiver.

*William A. Fisher* (with whom was *Robert Gilmor* on the brief), for the appellee, W. Gilmor.

The charter for the Terminal Company, and also for the Baltimore Belt Railroad Company, were both obtained by Mr. Miller and his associates during the month of December, 1888. The Maryland Central Railroad was also purchased at judicial sale and reorganized during the same month of December, 1888, and very soon thereafter, in the early part of 1889, the stock ownership of its railroad system was transferred by Miller to the treasury of the Transportation and Terminal Company. The object in thus uniting the ownership and control of these railroad lines under one management, was to furnish railroad terminal facilities in the city of Baltimore and on tidewater, and also to provide the means whereby an additional trunk line railroad system would be constructed between the anthracite coal regions of Pennsylvania, and tidewater at the city of Baltimore. Pursuant to this general plan, the Maryland Central Railroad was, during the years of 1889 and 1890, operated together with its connecting railroad in Pennsylvania, between the city of Baltimore and the city of York. The promotion and extension of the new line through Harford and Cecil counties, Maryland, and through Lancaster, Lebanon and Schuylkill counties, Pennsylvania, to the anthracite coal regions, was likewise actively progressing. The latter line embraced the Deer Creek and Susquehanna Railroad, which was also owned by the Terminal Company. The engineering features of this project were under the

supervision of Gustav Lindenthal and Samuel Rea (the latter leaving the service of the Pennsylvania R. R. Co., in Philadelphia, to accept the position.)   Both of these men were expert engineers in railroad construction.   To carry on this work, a large amount of money was expended for surveys, procuring rights of way, and in grading the line for the railroad.   The contract made between the B. & O. Railroad Company, the Baltimore Belt R. R. Co. and the Maryland Central Railway Co., granted to the Maryland Central Railway Co. system the use of the Belt Railroad and B. & O. terminals in the city of Baltimore for all traffic, including passengers, freight, and also coal for delivery in Baltimore, and at tidewater points.   That this grant and privilege was a very valuable one to this new railroad project, is shown by the evidence running all through the case.   This contract was dated January 6, 1890, and at that time, and for some months thereafter (during which time Du Puy became interested in the affairs of the Terminal Company), the whole Belt Railroad project was yet owned and held by Miller and his associates, who were actively engaged preparing for its construction, having already procured a large amount of property for rights of way, and had otherwise expended very large sums of money in connection with the survey, etc.

Now, as to the representations made by Lindenthal to Du Puy, we respectfully submit that the best evidence of what actually occurred, is what Lindenthal testifies to his having told Du Puy concerning his personal knowledge of the project, and his explanation of a map thereof made by him.   In the letter sent to Lindenthal by Miller, dated January 31st, 1890, which was written and signed by Miller under his own letter-head, the proposition was made by him (Miller) to Lindenthal, as follows: "You are aware the terms of the promoters in the syndicate are same as before; $75,000 for the block as above, with the privilege, at the expiration of one year from date, to return the preferred stock and receive therefor the $75,000 with interest, but to

retain the common stock, in any event. This common stock being the *speculation* to the *promoter* for the *loan* or the *investment* (as he may elect it to be at the expiration of the year as above described.")

. It will be observed that this is the letter which Mr. Miller directcd Mr. Lindenthal to show to Du Puy and was written on the lines set forth in the " sample letter " prepared by Lindenthal to be addressed to himself. The letter also dated January 31st, 1890, in which Miller enclosed this letter to Lindenthal, is as follows : " Dear Mr. Lindenthal :—Enclosed, I hand you the letter which is intended to show to the gentlemen mentioned by you. I also enclose a statement of the affairs of the Transportation and Terminal Company of Baltimore City, being the name of the company that is referred to in the letter as the T. & T. Co. of B. City. Kindly read the statement over carefully, so that you will be fully apprised of what this company is in our scheme. In a few words, it *represents* our pool or syndicate, into the treasury of which are now put, *and will hereafter be put*, the stocks and bonds of all the companies in the project. Therefore, the ownership of the stock of the T. & T. Co., means a proportionate ownership in all the other railroads."

Du Puy seems to have known at the time that in advancing his money on the stock, he was taking a risk along with Lindenthal, as he states ; that he told 'Lindenthal he would risk his money if Lindenthal did so. The result of Lindenthal's negotiation with Du Puy at the time seems to have been understood by him as a personal transaction between himself and Du Puy. The testimony of Lindenthal is to the effect that the money had been obtained by him from Du Puy as a personal matter between Lindenthal and Du Puy, and he (Lindenthal) so informed Miller by letter dated February 11th, 1890, and requested Miller to have the stock certificates made out in his (Lindenthals's) name. Lindenthal prepared in his own handwriting the option agreement, giving him (Lindenthal) or his transferrees of

the stock, the option and privilege to return the preferred stock after one year from date upon the payment to such then stockholder of the $60,000, &c.   The same form of option was followed subsequently in dividing the receipts and agreements in two papers, both of which were issued in the name of Lindenthal.   Lindenthal also seems to have treated the matter with Du Puy, as though the money was advanced by Du Puy to him in the nature of a personal loan, dependent upon Du Puy's election in the future, as to whether or not it should be accepted as an investment, or to be considered in the nature of a loan, in accordance with the wording of the option agreement.

The foregoing letters and the evidence connected there-with do not support the theory that Lindenthal and Du Puy were imposed upon, and induced to the belief that they were making an investment in the stock of a company, re-presenting a finished and completed project, and also that they were subscribing for this stock, and receiving the same as treasury stock directly from the company.   On the other hand, the theory of this transaction, which Du Puy and Lin-denthal attempted to maintain in their examination in chief, was a mere after-thought, and invention, for the purpose of making a basis for the litigation in which they have engaged.

When the Hostetter party had finally succeeded in wreck-ing the whole enterprise, and the Terminal Company be-came insolvent, and executed the deed of trust, Miller had a right to expect that both Lindenthal and Du Puy would stand on their contract of August 29, 1890, and demand an exchange of railroad bonds for their stock,—provided, of course, that they had not been engaged with Hostetter and his agents in their work of destruction; and, therefore, Miller thus knowing that he and his immediate associates constituted practically all the *bona fide* stockholders, de-cided, under advice of counsel, that it was proper to make the deed of trust.   Although this litigation was instituted some five years ago, no other ·stockholder has been in-duced to join therein.

It is contended that the paper called a prospectus, as used by Lindenthal, had the effect of influencing Du Puy.   Upon inspection of the paper it will appear that no such instrument or paper-writing was ever prepared, signed or seen by the appellee, William Gilmor, or any official of the Transportation and Terminal Company.   It will appear that the paper, sent under cover of Mr. Miller's letter, entirely without any concurrence or knowledge of Mr. Gilmor, as is incontrovertably established by the proof in the cause, was merely a rough, unsigned, type-written draft of what might at some future time have been desired, but no prospectus had ever been signed, agreed or fixed upon.   And still more eminently necessary is it to note, not only that not the slightest notice was given to Mr. Gilmor of what was thus done but that in view of the express explanation, in Mr. Miller's letter enclosing it; in view, too, of the fact that there was another letter suppressed or not used by Lindenthal, also enclosed together with it in Miller's letter of January 31, 1890; and more particularly in view of the testimony that Lindenthal showed this paper *pinned* or *annexed* to the letter of William Gilmor, written under date of February 6, 1890, without showing the letter of Miller qualifying it, such conduct can be looked upon in no other light than as a subtlly and deliberately formed design to mislead Herbert Du Puy in the very circumstance now sought to be attributed as a deceit practised by Miller and sought to be turned against these appellees.   This was an unscrupulous act, most cunningly contrived, and a grievous injury to Mr. Miller, who had so carefully guarded himself against the improper use of the paper, and shows Lindenthal to have been the chief instigator of any imposition that may have been practised.   The testimony shows that Lindenthal was deeply interested in aiding the project; he wanted to interest Du Puy in it, and in order to do so, he violated Miller's instructions, withheld the statement of the limitation that the company did not yet have all the securities stated, imposing on Du Puy, whose friend and agent he

was, and has now sought to shield himself by charging on others his own misconduct.

*Bernard Carter* for the appellee, Miller.

It is clearly established that at the time of the purchase by Lindenthal for Du Puy of the 800 shares of common stock and the 800 shares of preferred stock, *all* of said stocks were indisputably the property of Mr. Miller by virtue of his purchase of them from the company which issued them. Now, as the bill in this case is filed for the appointment of a receiver to take possession of the assets of the company, it is very certain that such receiver can have no claim to the $60,000 which was paid for the stock in question, unless when it was so paid, or thereafter, before said bill was filed, it became the property of the company; a receiver of the assets of the company can only take that which belonged to the company. Therefore, unless the $60,000, at the time it was paid, was the money of the company, or by something which took place after its payment, it became its property, its payment to Miller, and appropriation by him to his own use, cannot by any possibility furnish any reason for the appointment of a receiver, because, if the receiver were appointed, he would have no right to the money. Now, as there is no claim that by anything which occurred *after* the time when the money was paid by Lindenthal to Miller, the money became the property of the company, the whole question is whether at the time it was so paid, it was the money of the company. It having been shown that this money was the purchase money of stock belonging to Miller, the plaintiffs must show the existence of some act or thing by which it became the property of the company; that is to say, by means of which *his* title was conveyed to it.

Now, what is relied on by the plaintiff to show such a transfer of title? The most that can be claimed on behalf of the plaintiffs, under the testimony of Du Puy himself, is that when he purchased the stock he either supposed that (*a*) he was purchasing it from the company, or (*b*) that he

was purchasing it from a " syndicate," or (*c*) from a " pool." In one portion of his testimony he says he purchased it from the company, and gave as a reason for this statement that the receipt given for the money shows it was purchased from the company, and when he gave Lindenthal the checks for the $60,000 on February 2d, he told him to get the receipts of the company therefor, as he " would not deal with an intermediary." In another portion of his testimony, referring to the letter of Mr. Gilmor of February 6, 1890 (which told Mr. Lindenthal that " his allotment in *our syndicate*" would be so many shares), Du Puy says he did not know just what was meant by the syndicate. In another portion of his testimony he says, speaking of Lindenthal, and his going into the purchase on the same terms (Lindenthal's to the extent of $15,000): " We both went in according to the letter" (February 6, 1890), " stating that there was a *pool* of $100,000, to which Mr. Lindenthal and I both subscribed." Moreover, the certificates of stock given to him before he drew his check, were issued in the name of Lindenthal. In view of these contradictory statements, it cannot be claimed that he supposed he was purchasing the stock from the company directly. But however this may be, and whether it be true or not, as he says, that Lindenthal told him the money which he paid was to be used in purchasing real estate in the city of Baltimore, for the purpose of providing terminal facilities, is altogether immaterial to any issue in the present case.

It is perfectly clear that Du Puy on his own statement was induced to make the purchase because he believed the stock when he got it would be a *paying investment*. If, therefore, he got a good title to the stock he was purchasing he got all that he bargained for, no matter whose stock it had been before *it* was delivered to him; it was altogether immaterial whether the company delivered to him stock which was in its treasury belonging to it, or got that stock from Miller and delivered *it* to him; in either event he got what he agreed to buy.

If Du Puy was endeavoring to set aside the sale of the stock to him upon the ground that he made the purchase upon the faith of the representation that the stock belonged to the company, and that the proceeds were to go into its treasury, and that because of the false representation the sale to him was void, there would be some consistency in his contention, whether maintained or not; because, in the event that his contention was sustained, the stock would have to be returned, but in the present case the bill is filed by Du Puy and his wife as his assignee, *claiming all their rights as stockholders in this very stock*, and only asking the receiver may be appointed to take what are the assets of the company. If the money in question is assets of the company, it belongs to all the creditors, and after that to all the stockholders. In this money the Du Puys would have no greater interest than any other stockholder. Upon what possible theory can money which was the proceeds of Miller's stock belong to all the creditors and stockholders of the company merely because when Du Puy purchased the stock (his title and the title of his assignee, to which he is now setting up), it was falsely represented to him that the stock he was getting was the company's stock, when it was that of Miller? The only possible ground for a claim on the part of creditors and stockholders to the money thus paid would be that the stock was that of the company. If it was not it can make no difference, under the allegations of this bill, whether or not it was falsely represented to Du Puy to be that of the company. Moreover, as it was Miller's stock, in no event could Miller be obliged to pay the money now to the company unless the stock was returned to him, in which event the bill would *have to be dismissed*, as the plaintiffs would have ceased to be stockholders. To such a conclusion, so destructive of the plaintiffs' right to be in Court at all, does the contention of the plaintiffs lead.

*Winfield J. Taylor*, appellee, filed a brief.
This defendant was in nowise connected with the subject-

matter of the controversy, and had no connection with the affairs of the Terminal Company prior to his trusteeship, —except some labor on one occasion in connection with the title to the North avenue property.

Whilst the bill in this case charges defendant Taylor, trustee, with acquiescence after his appointment in the improper disposition of company's property, and failing in his duty to recover same, it also admits the company did not inform Taylor, trustee, of such disposition, nor require him to recover the same. The statement of trustee's acquiescence and failure of duty is not substantiated by a single fact in the record—but the contrary appears.

Wherein consider—1st. That to this day it hath not appeared that there are any assets of the company remaining of which the trustee might have gotten possession. 2d. That the efforts of the trustee to get the books of the company were not successful till after the N. Y. testimony was taken in this case. 3d. That this defendant's answer and his testimony shows he made every effort to get into his possession any additional property. This is practically admitted by Col. Marshall in his testimony.

What other charge is attempted to be made against this defendant? It is that as trustee he acted improperly in the disposition of the North avenue property. Wherein consider—1st. That whilst it is true this defendant was counsel for the Maryland Central, which acquired a part of this property, he was only such counsel in a limited sense, to-wit, junior Court counsel, with no voice in the internal affairs of said company, or matters connected with the sale of the property. 2d. That the trustee did not profit by anything in the whole transaction, no one disputes this. In fact, the trustee suffered by the transaction, in that he was paid only a small part of the compensation due for his labors. 3d. Irrespective of who ultimately got the property, the trustee obtained the best price thereof. 4th. Whilst the purchase money was not paid by Blick, it was paid by the Md. Central Company, or its successor, the B. & L. R. R.

Co., and M. H. Hauseman in this way: that their claims against the company, and trustee's claim on them for that much purchase money, were mutually released (instead of passing unnecessarily the actual money), and the balance was paid in cash by the Md. Central and Blick's purchase notes redelivered to him.   Blick was only a nominal purchaser who took the property in his own name to be transferred to the real parties furnishing the purchase money (as is usual in railway purchases), but this was not known to the trustee at the time.   The whole duty of the trustee lay in selling the property for a fair price and getting the purchase money, all of which he did.   Note that the claims of the Md. Central and of Mr. Hauseman were itemized, duly sworn to and were not excepted to, and the audit account containing them was finally ratified and confirmed, and that there is no evidence in the whole record of their being incorrect.

In what, then, has this defendant failed in his duties as trustee?   He has placed all his transactions on record in his Court where they have been ratified.   He has endeavored to obtain all property belonging to the company and straighten out its affairs.   He has sold the real estate for a fair sum.   And he received the purchase money therefor that was agreed to be paid, and distributed same to the creditors, as audited.   Not only is this trustee supported by the presumption of law, that the acts of an officer of Court are to be taken as correct until the contrary clearly appears, but by his record, in this case, which stands unshaken in spite of the insinuations of appellants' counsel.   This defendant therefore trusts his various acts, which have already been confirmed by two Courts below, will receive the approbation also of this Honorable Court.

*William A. Fisher* and *John K. Cowen* filed a brief for the Maryland Construction Company, one of the appellees.

McSHERRY, J., delivered the opinion of the Court.

The record in this case is quite voluminous, the transac-

tions which it unfolds are numerous, and the fraud which it exposes, is both bold and unblushing. The bill which opened the pending controversy was filed by stockholders of "The Transportation and Terminal Company of Baltimore City," in behalf of themselves and others who might join them, against that company and other corporations and individuals, who were made co-defendants ; and its object is to secure the appointment of a receiver, who shall be clothed with authority to institute appropriate proceedings to rip up the unlawful and fraudulent acts complained of, and to recover back the property which the officers of the Transportation and Terminal Company disposed of without warrant or color of law.

With respect to the legal principles applicable to such a case, there can be no dispute. A stockholder, though owning but a single share, may invoke and set in motion the plenary and far-reaching powers of a Court of Equity to investigate, strike down and strip of its covering any act of the corporation to which he belongs, when that act is tainted with fraud, or is *ultra vires* or illegal. This jurisdiction is one of the most salutary and conservative possessed by a Court of Equity, and neither the adroitness of the imputed fraud, nor the skill that seeks to hide the illegality of the impeached transaction will thwart the exercise of the Court's coercive and remedial authority. Mere internal dissensions among stockholders, or mere differences or disputes as to corporate management, so long as the officers or stockholders do no act that is fraudulent, illegal or *ultra vires*, will not warrant the intervention of a Court of Chancery; because in the absence of fraud, illegality or conduct that *is ultia vires*, the will of the majority is entitled to control the policy and the business of the body corporate. *Shaw* v. *Davis et al.*, 78 Md. 308 ; *Gamble* v. *Water Co.*, 123 N. Y. 91.

The Transportation and Terminal Company of Baltimore City was incorporated under the general laws, on December the thirteenth, eighteen hundred and eighty-eight. Its

authorized capital stock was fifteen millions of dollars.   On the very day the certificate of incorporation was signed, the five incorporators named in the certificate met, and each subscribed for one share of the capital stock, and thereupon proceeded to effect an organization.   The corporation was designed to be a pooling company, gathering together the stock and property of several other corporations, both existing and projected, and conducting and operating their distinct enterprises under one central management.   The chief promoter of the scheme was one John Henry Miller, and on the very day the company was chartered and formally organized, this same Mr. Miller submitted in writing a proposal to subscribe for fifteen thousand shares of preferred stock to be paid for in the following named property, viz., two thousand one hundred shares of the capital stock of the Maryland Central Railway Company ; four thousand two hundred shares of the York and Peach Bottom Railway Company, and four thousand shares of the Deer Creek and Susquehanna Railroad Company.   On the same day Miller subscribed for eighty thousand shares of the common stock to be paid for in certain property situated on North avenue and Oak street, in Baltimore City ; and on August the first, 1889, he again subscribed for sixty-nine thousand shares more of the common stock to be paid for with other lots or parcels of land situated in Baltimore, and by a transfer of twenty-two thousand five hundred shares of the capital stock of the Maryland Central Railway Company, and nineteen thousand nine hundred and fifty shares of the capital stock of the Penn Anthracite Coal Company. These two subscription agreements entitled Miller to the whole issue of the preferred stock and to one hundred and forty-nine thousand out of the total one hundred and fifty thousand shares of the common. stock of the Transportation and Terminal Company.   Twelve thousand eight hundred shares of the common stock were delivered to him or to his order.   Without pausing at this point to refer to other details and transactions, we come to the period when

Miller began operations to induce the plaintiffs to sub-
scribe for the preferred and the common stock of the
concern. A prospectus was prepared and a copy of it
was forwarded by Miller on January the thirty-first, 1890,
to Gustav Lindenthal, who had been connected with the
enterprise as civil engineer, and who had had frequent
interviews with both Miller and Gilmor, the president,
respecting the disposition of the company's stock. This
prospectus was sent by Miller in a letter where he says,
" I also enclose a statement of the affairs of the Trans-
portation and Terminal Company of Baltimore City. I
need not repeat to you how desirable for the purpose
mentioned in our late conversation it is to secure from fifty
thousand to one hundred thousand dollars, and your kind
offices in this direction will be very highly appreciated by sev-
eral of our best friends." The statement or prospectus thus
enclosed was intended to be shown to Mr. Du Puy, a friend
of Lindenthal, and a person who had been solicited to pur-
chase from the company some of its preferred stock. This
prospectus set forth, first, the names of the directors of the
Transportation and Terminal Company as follows: John
Gill, President Mercantile Trust and Deposit Company, Bal-
timore, Md.; James Sloan, Jr., President Farmers and Mer-
chants' National Bank, Baltimore, Md.; George S. Brown,
of Alexander Brown & Sons, Baltimore; J. Swan Frick,
attorney at law, Baltimore, Md.; William Gilmor Presi-
dent Maryland Central Railway Company, Baltimore, Md.;.
Samuel Rea, Vice-President Maryland Central Railway Com-
pany, Baltimore, Md.; George M. Jewett, President Deer
Creek and Susquehanna Railroad Company, Glennville,
Md.; T. M. Logan, New York City, Samuel Thomas, New
York City." William Gilmor, president; John H. Bryant,
vice-president; J. G. Case, secretary. Secondly, a state-
ment that " the company was chartered under the laws of
Maryland, in December, 1888, *and owns* the following prop-
erty: 27,000 shares, $100 par value, Maryland Central Rail-
way Company, the authorized capital of which is 30,000

shares; 4,000 shares, $50 par value, Deer Creek and Susquehanna Railroad Company, being two-thirds of the stock issued; 19,500 shares, $100 par value, of the stock of the Penn Anthracite Coal Co.; 1,500 shares, $100 par value, of the Maryland Construction Company of Baltimore City; extensive railroad terminal properties and buildings at North avenue, Baltimore." It then gave a statement of the company's annual income, which it represented to be one million two hundred and ninety thousand dollars. This was followed by representations which we transcribe in full, as follows:

" The Penn Anthracite Coal Company owns 2,700 acres of the best character of anthracite coals, situated in a body at Mt. Carmel, in Northumberland and Columbia Counties, Pennsylvania. The contracts between this company and a mining company, guarantee the payments of royalties which will annually net a minimum of $150,000 and may be double that amount.

" The contracts between the mining company and the Terminal Company for the marketing of coal guarantee, also, a minimum profit of $250,000.

" Through the operations of the Baltimore Belt Railroad Company the Terminal Company's properties at North avenue will produce a minimum rental of $100,000 from their use by the Baltimore and Ohio, the Maryland Central and other railroad companies using the Belt Railroad.

" Through the operations of the Maryland Construction Company, 60% of the stock of which is owned by the Terminal Company, $1,500,000 of the first preferred stock of the Baltimore Belt Railroad Company becomes the property of the Terminal Company; this stock is a 6% dividend payer, the income to provide which is guaranteed by the contracts between the Baltimore Belt Railroad Company, the Baltimore and Ohio Railroad Company and the Maryland Central Railway Company.

" The Belt Railroad Company's preferred stock alone provides for the 6% " guaranteed " dividend on the preferred

stock issue of the Terminal Company, which issue, limited to 15,000 shares ($100 par), with its 6% perpetual, accumulative annual dividends, is secured under the Maryland laws as a first mortgage lien on all the company's assets now and hereafter acquired, thereby making this stock an investment security.

" The ' Maryland Construction Company,' being the contractor for the building and completion of the ' Belt ' Railroad, expects a cash profit therefrom, sixty per centum of which the Terminal Company receives, this being estimated as sufficient to pay dividends on the first preferred stock during the construction of the ' Belt Line ;' but the royalties from the mining of the coal on the Penn Anthracite Coal Company's property commence immediately, these alone being sufficient to provide for the first preferred stock interest."

On February the sixth, 1890, William Gilmor wrote in his official capacity as president of the Transportation and Terminal Company to Lindenthal, a letter from which the following extracts are taken :

" Dear Mr. Lindenthal : In the present additional allotment of our syndicate affairs, your proportion would be one thousand (1,000) shares of preferred stock, $100,000 par value, and one thousand (1,000) shares of common stock, on the same terms to the promoters as before, $75,000 for the block as above, with the privilege, at the expiration of one year from date, to return the preferred stock and receive therefor the $75,000, with interest. The 1,000 shares of common stock remaining in your hands as the profit on your share in the syndicate, the par value whereof is $100,000.

" If you are, perhaps, not able now to take the entire block, you are at liberty to have some friend, acceptable to us, join you. Kindly advise me as to your decision at the earliest date.

" As our Belt Line contracts with the B. & O. have been approved and the passage of the city ordinance is assured,

we must proceed promptly to complete the purchase of the right of way and station properties.

" You are aware the Belt bonds have been placed with the ' Browns.'    Thus we are in good shape now for future operations, and should lose no time in carrying forward our part of the project."

Relying with implicit confidence on the truth of the representations made in the prospectus, and trusting to the assurances given by Gilmor in the above letter of February the sixth, Mr. Du Puy agreed to purchase from the Transportation and Terminal Company eight hundred shares of preferred stock and 800 shares of common stock, for which he delivered to Lindenthal two checks, each for thirty thousand dollars, and each bearing date February the twentieth. Seven days later two receipts, each one acknowledging the receipt of thirty thousand dollars in payment for four hundred shares of preferred stock and four hundred shares of common stock, were signed by Gilmor, as president, and in each receipt it was stipulated that " the holder of said stock shall have the privilege to return after one year from date the said 400 shares of said first preferred stock, and to receive therefor from the said company thirty thousand ($30,000) dollars and six per cent. interest, after deducting the amount of dividends paid by the company on said shares, and to retain the 400 shares of common stock of said company."    Not one cent of this sixty thousand dollars was paid to the Transportation and Terminal Company or ever went into its treasury.    One check passed into the possession of Gilmor, and was deposited to his individual credit.    After he had deducted ten thousand dollars to pay himself a debt due to him by Miller, he gave his own checks to Miller for the residue.    The other thirty thousand dollar check was turned over by Miller to Samuel Rea, who, after paying himself four thousand dollars for four months salary as vice-president of the Maryland Central Railway Company, and after paying something over ten thousand dollars to a contractor for work on the Maryland

Central Railway, turned the balance over to Miller. This disposition of the money was unknown to Du Puy. It is simply impossible to read these letters and receipts to which we have referred, without giving credence to that part of the testimony of Lindenthal and Du Puy wherein they both unequivocally assert that they never imagined the stock purchased with the proceeds of the two thirty thousand dollar checks was the property of Miller. They both unquestionably believed the representations made to Lindenthal, that the stock belonged to the Transportation and Terminal Company, and was being sold for its uses and benefit, and especially for the purchase of terminal facilities in Baltimore. The pretext that Mr. Gilmor signed by inadvertence the receipts in his official capacity instead of individually, finds no support outside of his own declaration, and that declaration is neutralized by his letter of February the sixth, wherein he made in almost the identical language used in the receipts, the statement with respect to the repurchase by the company of the preferred stock at the end of one year. Besides, it is not perceived what Gilmor could possibly have had to do with signing any receipts for this sixty thousand dollars, if the parties to the transaction understood that Du Puy was purchasing stock that actually belonged to Miller. And to clinch the matter Miller, himself, as late as August the twenty-eighth, 1890, wrote to Lindenthal that he, Miller, would take and pay for the preferred stock referred to in the letter of William Gilmor, president, dated February the sixth, " if the Transportation and Terminal Company shall refuse or neglect to comply with their engagements in the premises."

Whether a deliberate scheme to deceive and to entrap the credulous and unsuspecting had been devised by Miller upon a large and imposing scale, and had, either actively or through culpable inattention or inexcusable indifference to consequences, been furthered or aided by others connected with the Transportation and Terminal Company, it is not material to inquire; but that such a scheme was ulti-

mately developed, is too obvious to admit of discussion. The prospectus prepared by Miller, the active and reckless promoter and founder of the enterprise, was false in almost every particular. Of the five prominent and widely known business men named as directors of the Transportation and Terminal Company not one occupied that position, and out of the whole list of seven none but Gilmor and Rea were in fact connected with the undertaking. The Transportation and Terminal Company did not own twenty-seven thousand shares of the Maryland Central Railway Company's stock; nor fifteen hundred shares of the Maryland Construction Company's stock; nor an interest in the Belt Railroad Company, though the prospectus flatly alleged that the Transportation and Terminal Company " owns " those shares. And the statement that one million five hundred thousand dollars of the first preferred stock of the Baltimore Belt Railroad Company became the property of the Terminal Company, and that the Belt Railroad Company's preferred stock alone provides for the six per cent. " guaranteed " dividend on the preferred stock issue of the Terminal Company was without the semblance or shadow of truth. The " six per cent. perpetual, accumulative, annual dividend  *  *  *  *  secured under the Maryland laws as a first mortgage lien on all the company's assets now and hereafter acquired," was a pure fabrication devoid of the faintest prospect or the remotest possibility of a realization.

The stock ledger of the Terminal Company shows that seven thousand five hundred shares of preferred stock were disposed of to sundry individuals, but the record does not disclose the amount received therefor. If the sales were made at the same figures charged Du Puy, nearly half a million of dollars were realized; and if realized doubtless went into the pockets of the enterprising and speculative promoters. Having secured all the money that was obtainable, Miller and the Terminal Company's officers turned their attention to the project of dismantling the company of whatever assets it had and of then winding it up. This

feature of the case is most astounding. In the vigorous language of one of the distinguished counsel for the appellants, "it dignifies these transactions to call them frauds."

One of the avowed objects of the pooling company was by acquiring the majority of the stock of the Penn Anthracite Coal Company to control the latter's shipments and business. The construction of the Deer Creek and Susquehanna Railroad to the coal fields of Pennsylvania was a part of the general plan, and the evidence indicates that those coal fields gave promise of being the most valuable assets of the concern. Now, Miller by his subscription contract of August the first, 1889, had agreed to place in the Terminal Company a controlling interest in the stock of this coal company, and to that extent to give a tangible value to the shares of preferred stock. But when the scheme of dismantling began, the very first step taken by the directors of the Terminal Company at the instance of Gilmor and upon the request of Miller, was to cancel this subscription on August the sixteenth, 1890, just six months after Du Puy had paid his sixty thousand dollars of actual cash. Miller was thus relieved from his obligation to assign the Penn Anthracite Coal Company's stock to the Terminal Company, and the only consideration for this action was Miller's forbearing to take sixty-six thousand five hundred shares of the common stock which he had previously agreed to take. As by this arrangement one of the chief sources from which there was ever any prospect of value accruing to the pool company's stock was deliberately cut off, the objects of the company became, as was claimed, materially changed. Accordingly, on November the eighth, 1890, the president, William Gilmor, made to the board of directors the following statement: "I have had considerable talk with the parties interested in the affairs of this company, and it seems desirable, as the purposes for which the company was originally formed have been in some respects materially changed, that we had better take some action and appoint a committee to discuss with stockholders and parties interested, some

plan of *winding up the affairs of* the company." A com-
mittee of three, including the president, was thereupon ap-
pointed "to confer with parties in interest, and counsel, as
to the advisability of adjusting, settling and *winding up* the
affairs of this company." On the fourth of December the
committee reported that "in order to settle and adjust the
indebtedness of this company, as well as to properly relieve
it from its obligations, we deem it advisable for this com-
pany to make, execute and deliver a deed of trust to some
suitable trustee." It was then resolved "that the affairs of
the Transportation and Terminal Company of Baltimore
City be *wound up*, and the assets and property of said cor-
poration be sold and disposed of and the proceeds distrib-
uted according to law to those entitled thereto, and a deed
executed *for these purpoees*, with the necessary legal for-
malities, unto Winfield J. Taylor, as trustee." On the same
day, December the fourth, the Terminal Company executed
a formal deed of trust. On the very next day Taylor, who,
in a report filed in Circuit Court No. 2, on December the
fifth, stated under oath that he had been appointed "*to wind
up* the affairs of this corporation," entered into an agreement
in writing with Miller wherein it was stipulated, subject to
ratification by the Court, that Taylor as trustee of the Ter-
minal Company would deliver and quit-claim to Miller the two
thousand one hundred shares of the Maryland Central Rail-
way Company's stock and the four thousand shares of the
Deer Creek and Susquehanna Railroad Company's shares,
and release him from any and all further payments of money,
stocks, bonds, securities or property whatsover on account of
his, Miller's subscription to the Terminal Company's stock,
provided Miller would, in consideration of such delivery, quit-
claim and release, assign to Taylor, the trustee, eleven thou-
sand shares of the preferred stock of the Terminal and would
relinquish his claim to any further shares of common stock
beyond the twenty thousand shares heretofore agreed to be
issued to him. In his report to the Court on the sixth of
December, the trustee stated that this arrangement had the

approval of a majority in value of the creditors of the Terminal Company and a majority of its stockholders.    In a moment we shall see who the creditors were.    The stockholders, other than the preferred ones, were Miller and the directors—the latter holding but a few shares.    Upon the representations made in this *ex parte* report, Circuit Court No. 2 ratified the agreement between Miller and Taylor, and as a consequence Miller was released from his obligation to deliver to the Terminal Company the shares of stock of the Maryland Central Railway and of the Deer Creek and Susquehanna Railroad, which he had bound himself to deliver, and the Transportation Company got in exchange nothing but its own preferred stock, which had been diminished in value to the precise extent that the surrendered shares in these other companies had any appreciable worth.    This was a step in the declared scheme to wind up the affairs of the company in the interest of the parties who had selected the trustee ; but it was not a step that would ever have been taken had the design of the directors and their trustee been to realize whatever the assets would fairly bring and then in good faith distribute them to the creditors, if any they were.    This proceeding was unlawful, but indefensible as it is, it is by no means as reprehensible as the acts to which we are now about to allude. Whilst it is perfectly well settled that a corporation in failing circumstances may make an assignment for the benefit of its creditors, *State* v. *Bank of Md.*, 6 G. & J. 205 ; *Merrick* v. *Bank*, 8 Gill, 59 ; yet this is quite different from an attempt to wind up and dissolve a corporation and to destroy its existence under the pretext of merely paying its creditors. It is the object of an act that determines its character.    If, then, the object of the directors of the Terminal Company was, as stated by them in the resolution which they passed on December the fourth, to wind up the affairs of the company, their proceeding was illegal ; because the mode pointed out by the statutes to effect that end was not pursued and no other one could be substituted.    The Code, Art. 23,

sec. 264 *et seq.* prescribes in detail the method to be followed in the formal winding up of a corporation. It is only necessary to say that in this instance the method therein provided was not observed, either in form or substance. If, then, the design was in fact to wind up the concern, the attempt was abortive and illegal. If, on the other hand, the design was, under the cloak of a deed of trust, to accomplish the same end, then also was the proceeding illegal; because, no matter what the form of the proceeding if the ultimate and ulterior purpose were forbidden to be accomplished in that particular way, the means employed to bring about the unlawful result would, in consequence of the unlawfulness of the result, themselves be unlawful. But if, passing by the declared intent of the deed as evidenced by the resolution we have quoted, we concede that the deed was in fact and was designed to be a deed of trust such as a corporation in failing circumstances may lawfully make, its validity, like the validity of every other deed of the same character must depend on the good faith of both the grantor and the trustee. If the deed does not in terms hinder or delay creditors, then it is valid whatever may have been intent of the grantor, unless the trustee becomes implicated in the fraud. It is only where the trustee does become implicated in the grantor's fraud that a deed regular on its face can be made to hinder and delay creditors; and in such a case the deed is void. *Ferrall* v. *Farnen*, 67 Md. 76. We come then to inquire whether the trustee was involved in and connected with the fraud which incontestibly influenced, under the dominion of Miller, the officers of the Terminal Company in making the deed of trust.

Such an inquiry is, to some extent, of a metaphysical character, because it involves an investigation into an undisclosed and deliberately concealed mental design. A fraudulent intent unexecuted is a mere mental concept. It is intangible. When executed it is generally not susceptible of proof otherwise than as extrinsic, visible acts which owe

their origin to it, indicate its antecedent or coincident existence. You cannot look into and see the hidden processes of the intellect; but as no rational creature does a deliberate act without some motive or design, you may, through the act when done and through all its attendant surroundings, deduce or discover the intent with which it was performed. In no other way can the motives of human conduct be fathomed or exposed, unless at the moment an act is done its purpose is truthfully declared by the actor himself. No power can act without an object as to the terms of its action, and as a cause that must specify that action; for all acts are specified, determined by their object. Even the will cannot elicit an act of free choice which concerns no object at all. Hence the act of an intelligent agent that concerns no formal object at all is inconceivable—it is nothing. Necessarily, then, an act which has been done by an intelligent agent had an object when it was done and that object must be traced back, to be discovered, through the act itself and through the surroundings which co-ordinate with it. Now, we have seen from their own recorded declarations what the design of the officers and directors of the Terminal Company was. Did Taylor participate therein? He was conferred with about the execution of the deed of trust and was evidently familiar with the condition of the company's affairs. On the very day that the resolution was passed authorizing the winding up of the company the deed of trust to Taylor was executed. It was filed for record the following morning and thereupon the petition hereinbefore alluded to praying for permission to return to Miller the stock, already described, was filed by Taylor and was acted on at his instance by the Court. This haste showed considerable familiarity on the part of Taylor with the subject and indicates a preconcerted arrangement between him and Miller, who obviously controlled the directors, to strip the company of much of its apparent assets. After the completion of this transaction no steps appear to have been taken by the trustee until the seventh day of February,

1891.   On that day Taylor filed a report of sales, wherein he reported that he had sold at private sale the lots of ground conveyed by Miller to the Terminal Company in payment for stock as stated in a former part of this opinion; and that Thomas H. Blick was the purchaser for the total sum of one hundred and twenty-one thousand, twelve dollars and thirty-three cents.   The report declared that the purchaser, Blick, will pay " in money the sum of thirty-five thousand, twelve dollars and thirty-three cents, in three payments * * * * * he will assume from date and pay the liens now existing upon the property," and the liens are then set forth and described.   Now, the truth is that Blick, who was only a clerk in the office of William Gilmor, President of the Baltimore and Lehigh Railroad Company, though he signed the report of sales, never did purchase the property and never was financially able to do so.   He testified that Taylor and Gilmor called on him and that Gilmor stated that " they desired me to take charge of some property which they wished to deed to me, and desired me to hold it until such time as they should ask for a re-transfer, and I think Winfield Taylor remarked to me that it was a large purchase.   I at once said to him, ' I am not purchasing property ;' he said, ' all right, Blick, the purchase money will be provided and you can just take the deed of this property, which will not involve you in any way, and it will be an accommodation to the company, they will make all the payments ; as an employee, of course, I felt disposed to accommodate them, and I remarked to them at the time, ' Gentlemen, this property is an elephant, and I do not buy any elephants.   They said that was all right, and I took the property with the understanding that I was to deed it to them whenever they wished. I told them the only trouble was that in the event of my death they might get tied up in some way."   Further on he was asked, " was it ever intended between you and Hauseman and Taylor and Gilmor that you should pay the amount of money which you undertook to pay by this con-

tract?" And he answered, " On the contrary, they assured
me that I should not pay it, and should not be required to
pay it." On the ninth day of April, 1891, Taylor conveyed
this property to Blick, and in the deed stated that " Blick
hath fully paid the purchase money agreed by him to be
paid." This statement was absolutely without foundation.
It was never intended that Blick should pay, and in point
of fact he never did pay a single cent of purchase money.
On April the twenty-fifth, Blick, at the request of the real
purchasers, conveyed a portion of the property pretended
to have been sold to him, to Moses H. Hauseman, the gen-
eral solicitor of the Terminal Company, for the expressed
consideration of five dollars and other good and valuable
considerations ; and on the seventh of September following,
Blick conveyed to the same grantee others of said lots for
a like expressed consideration ; and on the same date he
conveyed to the Baltimore and Lehigh Railroad Company,
of which Gilmor was president, the residue of the property
so purporting to have been bought from Taylor. The con-
sideration mentioned in the deed to the Lehigh Railroad
Company was thirteen thousand seven hundred and twenty-
three dollars. Not one cent of this sum ever went into the
hands of Blick. On the sixth of April the trustee procured
an auditor's report to be ratified. In that report he was
charged with the whole pretended purchase money, viz.,
$121,012.33, when in fact he had received none of it. He
was allowed $9,680.98 commissions, as though he had col-
lected the entire proceeds of sale ; and the net balance was
distributed in partial payment of the claims filed by Moses
H. Hauseman, the Maryland Central Railroad Company
(the predecessor of the Baltimore and Lehigh) and Winfield
J. Taylor. These three were all the creditors of the Ter-
minal Company. These claims are said to constitute the
considerations for the subsequent conveyance made by Blick;
and this audit is said to demonstrate that the Terminal Com-
pany was insolvent. Without making particular allusion to
the conveyances which followed, it is sufficient to say that

this property, which is called in the prospectus the terminal property, got into the hands of the very parties who, under antecedent contracts, were designed ultimately to acquire it. The trustee, whilst having full commissions allowed to himself so as to indicate an apparent insolvency of the Terminal Company, did not claim and was not paid his commissions and his audited fee, but only about one thousand dollars, or less than one-tenth of the whole.    Upon the basis that he received only about one thousand dollars, the Terminal Company could have paid in full the three claims filed against it and would not have shown an apparent insolvency. Thus by the acts of the trustee the assets of the company were gotten rid of; its property was sold under a purely fictitious sale, and eventually got into the hands of parties who were designed to have it; and the trustee deliberately relinquished his commissions because, as he says, he thought the parties interested would make this up to him in some other way.

It is simply impossible, on looking dispassionately into these occurrences and tracing them back to their origin, to avoid the conclusion that the results reached were the identical results intended to be reached when the resolution to appoint a trustee was adopted; and it is equally impossible to hold that these results could have been brought about as originally designed to be accomplished, without the active and willing co-operation and assent of the trustee.    Circuit Court No. 2 was misled into ratifying a sale, which, instead of being a sale in fact, was a mere sham; and this the trustee knew and was instrumental in having done.    If he imposed upon the Court he could not have been acting innocently; and as the ultimate outcome of all that he did was to bring to pass, under the outward forms and semblance of law, precisely the things which the directors by their prior determination intended should be done and done through the instrumentality of a trustee, his intent—the color and character of his intent—in doing what he did cannot be mistaken.    He was obviously a perfectly willing

instrument to put into the shape and appearance intended the plan or scheme agreed upon. On no other possible hypothesis can his actions throughout be explained. On that hypothesis his conduct is consistent.

We have, then, illegal conduct, fraudulent acts and *ultra vires* proceedings ; and a Court of Equity is asked by the persons who have been victimized to appoint a receiver who may rip open all these actions. Can it refuse to grant relief ? If it is powerless to do so, not only would the law be open to grave reproach for inefficiency, but serious wrongs would go unredressed and fraud of a stupendous character would escape and go unrebuked. It is not for us to say what particular assets or property a receiver can, when appointed, recover. It is enough for the purposes of this case for us to be able to see from the record that wrong and fraud have been perpetrated, and that this is an eminently fit case for the appointment of a receiver to unmask and rip open whatever is not beyond the reach of successful assault.

We shall, therefore, reverse the decree below which dismissed the bill, and remand the cause for further proceedings.

> *Decree reversed with costs and cause remanded for further proceedings.*

(Decided January 9th' 1896.)

Subsequently a motion for a re-argument was made and overruled.

BRYAN, J., delivered the following opinion, agreeing to the overruling of the motion for re-argument, but dissenting from the opinion of the Court on the question of fraud.

I wish to express my views on the charges of fraud which are made in the bill of complaint. To do this in a satisfactory manner, it will be necessary to take a general view of the circumstances which have occasioned this controversy.

The Transportation and Terminal Company was chartered in December eighteen hundred and eighty-eight.    It embraced in its scope a great many objects which are set forth in detail in the charter.    The number of shares was fixed at one hundred and fifty thousand, and the par value of each share was one hundred dollars.    The operations of this corporation were projected on a very large scale ; contemplating the control and management of the Baltimore Belt Railroad Company, the Maryland Central Railway Company, the Deer Creek and Susquehanna Railroad Company, the York and Peach Bottom Railway Company, and also the acquisition of a large number of shares of the Penn Anthracite Coal Company and other corporations.    This enterprise was supposed to offer good prospects of great profits to those who would embark in it ; but like many similar undertakings it came to a disastrous issue.

It is not surprising that persons, who have risked their money in a speculation and have lost, should find fault with those who had the management of it.    They very frequently vent their displeasure by wholesale charges of fraud and misconduct.    But when such questions are presented for investigation in a Court of Justice, they must be sustained by proof.    I will consider the testimony on this subject. Much of it is irrelevant ; much of it hearsay ; much of it is brought out by leading questions frequently repeated against the protest of counsel ; and a very large portion of it comes from a witness incompetent to testify.    The two principal witnesses for the plaintiffs are Herbert Du Puy and Lindenthal.    In all points affecting the charges against the defendants the testimony of Du Puy is entirely hearsay ; he knows nothing whatever about it, except what he says was told him by Lindenthal.    On page forty-five of the record he says in answer to a cross-interrogatory : " I have had nothing to do with any one else outside of Mr. Lindenthal and the counsel in the case."    On page sixty-eight, in speaking of William Gilmor in answer to a cross-interrogatory, he says : " He is the only officer I know ; I

have never had any correspondence with any of them." On pages sixty-nine and seventy, when asked upon what information and belief he based some of the most offensive charges of fraud, he says: "I decline to state." On these occasions he was instructed by his counsel not to answer. On page seventy a cross-interrogatory was propounded to him in this form: "You spoke in your testimony of an option being given you by a Mr. John Henry Miller;" and he answered: "I didn't; I never had anything to do with Miller; never saw him and never saw a letter from him; didn't know him at all." When Lindenthal is called as a witness the defendant's counsel examined him on his *voir dire*. This is what took place: "Defendant's counsel desires to ask the witness the following questions: Q. Do you believe in the existence of a Supreme Being?

A. I have the right to affirm. (Counsel for plaintiffs objects to the question.) (Counsel for defendants says that he is examining the witness on his *voir dire*, to see whether or not he is competent.)

Q. Do you believe in the existence of a Supreme Being?

(Counsel for plaintiffs renews his objection.) The witness does not answer.

Q. Do you believe or not in a future state of rewards and punishments? The witness does not answer. (Defendant's counsel objects to the swearing of the witness and the taking of his testimony and renews his general objection to this whole proceeding as being irregular and void.") The witness was then permitted to affirm. The charges brought against the personal integrity of Gilmor and Miller rest on the testimony of these witnesses. The thirty-sixth article of the Declaration of Rights makes it necessary for the qualification of a witness that he shall believe in the existence of God, and that under His dispensation he will be morally accountable for his acts, and be rewarded or punished therefor in this world or the world to come. Here is a witness, who when put to the question fails in the most important requisite of competency, and is sustained by coun-

sel in seeking to introduce his testimony in the case. I am aware that many of the modern authorities object to the examination of a witness on his *voir dire* as to his religious belief. Yet in 2 *Taylor on Evidence*, page 1201, it is said that the "witness may be interrogated in respect to his religious belief, either before he is sworn at all, or after he has been sworn on the *voir dire*, or even, as it would seem, after having been sworn in the cause." And this Court in *Arnd* v. *Amling*, 53 Maryland, p. 199, in commenting on this passage from Taylor, says that "the inquiry into the competency of the witness, being preliminary and not final, conducted by the Court to ascertain the condition of the witness's mind in a matter of creed, the mode of proceeding was discretionary with the Judge, if not contrary to law." The question of practice is hardly worth considering in its bearing on this case, especially as no exception to the evidence has been filed in the cause in the manner required by the rules of practice. An insensibility to the obligations of an oath is imputed to the witness, and when formally interrogated as to his supposed moral deficiency he, by the advice of counsel conducting the examination, stands mute. And the great mass of the impeaching testimony is derived from this witness and another, who has learned from him by hearsay what he has to say. But I think that it would not be just to the defendants if this case should be decided merely on the failure of proof. There is other evidence which should be considered. On the day of the organization of the Terminal Company, John Henry Miller submitted an offer to subscribe for eighty thousand shares of its common stock, and to pay for it by the conveyance of certain leasehold property in the city of Baltimore, at the corner of Oak street and North avenue, and by the delivery of a moneyed consideration. The proposition was, that on the payment of one thousand dollars the Terminal Company should issue to him ten thousand shares of full paid common stock ; sixty-five thousand shares of said stock when Miller should deliver the deeds of conveyance

for the leasehold property free of all liens, except the ground rent, and five thousand shares when paid for in cash at the rate of a hundred dollars a share. On the same day he made a proposition to subscribe for fifteen thousand shares of the first preferred stock of the Terminal Company which he offered to pay for by assigning shares of the Maryland Central Railway Company ; of the Deer Creek and Susquehanna Railroad Company ; and of the York and Peach Bottom Railway Company. Miller's proposition was not acted on by the Terminal Company until the first day of the following August. On that day he offered to subscribe for sixty-nine thousand other shares, and offered to modify his former proposition in some respects. He offered to assign to the Terminal Company twenty-two thousand shares of the Maryland Central Railway Company, nineteen thousand five hundred shares of the Penn Anthracite Coal Company, and also to convey to it certain real estate lying at the intersection of North avenue and Oak street (in addition to the tract embraced in the former proposition ;) also five hundred of the general mortgage gold bonds of the Maryland Central Railway Company, in lieu of all amounts previously agreed to be paid by him in cash ; also to deliver in exchange for the York and Peach Bottom stock three thousand additional shares of the stock of the Maryland Central Railway ; and also to deliver first mortgage bonds of the Deer Creek and Susquehanna Railroad to the par value of one hundred and fifty thousand dollars, in consideration that the Terminal Company would assume the balances due and to become due by him for the purchase of the real estate just mentioned. On this first day of August, eighteen hundred eighty-nine, the Terminal Company at a general meeting of the stockholders accepted Miller's proposition for stock. After these proceedings the president of the company resigned, and William Gilmor was elected in his place. The Honorable John K. Cowen was, at the same meeting, elected general counsel, and he is one of the counsel for defendants in this case. At a later date the gentlemen

whose names appeared in the paper designated a prospectus agreed to become directors.    Although it has been maintained that they were never directors yet the evidence shows that they consented to serve.    Some of this evidence was brought out by the complainant's counsel in response to direct questions on examination in chief (Record page 237); and the rest is offered by the defendant (Record pages 266 and 270.)    And all of it is entirely uncontradicted; although an attempt to disprove it was made by the plaintiff in a rigid examination of Case, one of his own witnesses.    It is testified that in point of fact they did not serve as directors, because of troubles which had occurred affecting the company.

At first every one connected with this enterprise seems to have had great confidence in its success.    During the years eighteen hundred and eighty-nine and eighteen hundred and ninety, the Maryland Central Railway was in operation with the connecting railroad in Pennsylvania, between Baltimore and York ; and the extension of new lines to the property of the Anthracite Coal Company was also actively urged forward.    Gustave Lindenthal was the consulting engineer of the Maryland Central Railway and its extensions.

He made an elaborate report on the revenue, which might be reasonably expected from this source, and set forth the advantages and value of the line in the most flattering terms.    He also wrote to John Henry Miller a carefully and elaborately prepared letter giving his views on the subject.    In January eighteen hundred and ninety a contract was made between the Baltimore and Ohio Railroad Company, The Belt Railroad Company and The Maryland Central Railway Company, by which The Maryland Central system acquired the right to use the Belt Railroad and B. & O. terminals, in the city of Baltimore, for all traffic, including passengers, &c., for delivery in Baltimore and at tidewater points.    Whilst matters bore this aspect, Lindenthal, being fully acquainted with the condition of the Ter-

minal Company and its prospects, and holding intimate relations with Miller, made proposals to Du Puy on the subject of investing money in the enterprise.

He impressed Du Puy with a very favorable opinion of the scheme; and he states that he showed him a map of the line which he had located, and gave him all the information which he himself possessed. The result of his dealings was that Du Puy authorized him to obtain for him eight hundred shares of the preferred, and eight hundred shares of the common stock at the price of sixty thousand dollars. He states in his testimony that it was a personal matter which he had arranged with Du Puy (Record p. 257;) and he so informed Miller by letter dated Feby. 11th, eighteen hundred and ninety (Record p. 158), and he requested that the certficates should be made out in his own name. The stock undoubtedly belonged to Miller, the negotiation for the purchase of it was made with him, and the checks in payment for it were sent to him by Lindenthal. He says in his answer that he sold it to Lindenthal; and he reiterates this statement when testifying as a witness for the plaintiffs. Gilmor testifies that as Miller had no bank account in Baltimore, he placed one of the checks in bank for Miller's accommodation, and after reserving ten thousand dollars of the amount in payment of a debt due to him by Miller, he paid over the balance to him. It may be asked why should the president have signed the receipts for the stock in his official name. It should be remembered that each of the receipts contained an agreement that the holder of four hundred shares of common stock and four hundred shares of preferred stock, should, after the expiration one year, have the privilege of returning the preferred stock, and receiving thirty thousand dollars from the Terminal Company while he kept the common stock. This was a valuable right attached to the stock; and it might also be of advantage to the company in case the stock should be enhanced in value. It was also just to the holder, because this privilege was

one of the conditions of sale, and Lindenthal desired to have the company's written assent to the agreement to take the stock on the terms mentioned.  Gilmor testifies that the advantage to the company was the motive which induced him to sign it.  (Record, page 264.)  On cross-examination, he testified that when the receipt was laid before him, he was busy with some railroad matters, and it was stated to be the request of Lindenthal, and he signed it inadvertently ; meaning, as I suppose, that he signed it without giving much attention to the matter.  In this connection we must bear in mind that in his letter of February 6th, 1890, to Lindenthal, in speaking of the " allotment of our syndicate affairs," Gilmor stated to him that at the expiration of one year he would have the privilege of returning a thousand shares of preferred stock and receiving seventy-five thousand dollars, while he kept possession of a thousand shares of a common stock as the profit of his shares in the syndicate.  (Record, page 205.)  And Miller, under date of August, 1890, writes to Lindenthal that if the Terminal Company should refuse or neglect to comply with this engagement that he (Miller) would take and pay for the preferred stock on the same terms.  All through this record we see it clearly evident that Lindenthal was a member of a syndicate actively engaged in promoting this enterprise, and of course expecting to reap large profits from its success.  He was as well acquainted with its resources and prospects as any one connected with it.  He was in close intercourse with Miller, and his consultations were exclusively with him.  He wrote with his own hand what he called a " sample letter " and enclosed it to Miller, telling him to word it as he thought best.  This was prepared for the purpose of having it addressed to himself by Miller.  In a letter dated January 31st, 1890, Miller enclosed to him a statement of the affairs of the Terminal Company.  In this letter, speaking of the statement, he said : " In a few words it represents our pool or syndicate into the treasury of which are now put, and will hereafter be put the stocks and bonds of all the

companies in the project." This letter was not shown to Du Puy; but, on the contrary, the statement was pinned to Gilmor's letter of Feby. 6th, 1890, and put in Du Puy's hands, without the necessary qualifying explanation. This statement is the original of Exhibit No. 2 filed with the bill, which has been alleged in the argument to have been fraudulently contrived to cheat and deceive. The evidence shows that this document was prepared by Miller and Lindenthal conjointly, and that some of the property was in the possession of the Terminal Company; some had been contracted for, and that there was a purpose and expectation to acquire the rest. Gilmor had nothing to do with the preparation of it, and had never seen it, and had no knowledge of any such paper until about the time of the bringing of the suit. (Record, pages 266, 267, 231, 232.) Miller testifies that he does not know of any copies of this statement being sent out. (Record, p. 232.) This speculation terminated very disastrously. It is impossible to suppose that every reasonable man would not know that although it might present prospects for great gain, yet there was also liability to considerable loss. It seems to have been defeated by disputes and dissensions regarding the Anthracite Coal Company. It is irrelevant to investigate the merits of the quarrel which proved to be so ruinous. Failure and disaster do not, however, imply fraud and misconduct. There may have been oversanguine anticipations, injudicious management and unwise proceedings. But in considering the results of such causes, let us ponder the calm and wise words of the Supreme Court of the United States: "The law does not hold one responsible for the extravagant notions he may entertain of the value of property dependent upon its future successful exploitation, or the result of future enterprises; nor for expressing them to one acquainted with its general character and condition. How could an overestimate in such a case be shown? Other estimates would be equally conjectural. The law does not fasten responsibility upon one for expressions of opinion as to matters in their nature contingent

and uncertain.    Such opinions will probably be as variant as the individuals who give them utterance.    A statement of an opinion assigning a certain value to property like a mine or a quarry not yet opened is not to be pronounced fraudulent because the property upon subsequent development may prove to be worthless; nor is it to be pronounced honest because the property may turn out of much higher value."    *Gordon* v. *Butler*, 105 United States, 557.    Mr. Gilmor is in my opinion undoubtedly entitled to be acquitted of the charges which have been made against him.    And I do not think that the evidence affords just reason to condemn Mr. Miller.

The sale of the property of the Terminal Company was under the control of Taylor, the trustee.    It cannot be imputed to him as a fault that he sold to Blick, a man unable to pay the purchase money; if he was representing persons who were able to pay.    In such case the agent would act for the principal; and no one would have any reason to complain, provided the principal should fulfill the undertaking in his behalf.

The auditor's report shows that the money was furnished and distributed to the creditors of the corporation. In point of fact the settlement was in this wise; the claim for the purchase money was settled by being set off against debts due to the purchasers by the corporation.    The subsequent transactions relating to the exchange of stock for securities by Miller should be investigated in a future proceeding. This Court cannot in this case pass any decree which will settle and adjust the rights involved in these transfers, and give redress if any should be found to be due.    It will injure no one to let these questions abide the result of such steps as the receiver, to be hereafter appointed, may be advised to take.

Lindenthal and Du Puy have made common cause in this controversy; although Lindenthal has not become a party to the suit.    They represent stock for which they paid seventy-five thousand dollars.    So far as the record shows,

there is no complaint from any other stockholder, and there is no other stock involved in this controversy.

Filed March 27th, 1896.


BOYD, J., delivered the following opinion in which FOW-LER, J., concurred.

Although I concur in the conclusion reached by the Court, that the facts presented by the record author-ize the appointment of a receiver of the Transportation and Terminal Company of Baltimore City, I cannot agree with all that is said in the opinion of some of the persons con-nected with the company.    It is true that certain expres-sions used in it were somewhat modified after the motion for a reargument was made and considered, but it fails to state some evidence given by William Gilmor and others, which to some extent, at least, explains some of the trans-actions that without such explanations may be susceptible of the construction placed on them in that opinion.

The dealings with Herbert Du Puy, which resulted in his purchasing 800 shares of preferred stock of the par value of $80,000, and eight hundred shares of common stock of the same par value for $60,000, were carried on through Gustav Lindenthal.    A very careful and thorough exam-ination of the record has convinced me that Lindenthal was fully aware of the character and condition of the company. With the knowledge he actually had and the opportunities afforded him of acquainting himself with the general scheme and status of the company, it would be asking a great deal of a Court of Justice to give him relief for fraud and deception practiced on him, if he was a plaintiff seek-ing redress on that ground.    The sale of the stock was to him and not to Du Puy, although it was known that he ex-pected to get other parties interested in the transaction. The stock was issued to him and the two receipts for $30,000 each, signed by Mr. Gilmor, stated that the money was " received of Gustave Lindenthal," and Du Puy's

name does not appear in them.  Lindenthal prepared a "Sample letter," in which he gave an outline of what should be written to him by John Henry Miller—on which he wrote " Private."  " Sample letter.  Word it as you think best."  On January 31st, 1890, Miller wrote in accordance with the suggestions in the " Sample letter," and on the same day wrote another letter to Lindenthal enclosing a statement which is spoken of in the majority opinion as a " Prospectus," in which he says, " Kindly read the statement over carefully, so that you will be fully apprised of what this company is in your scheme.  In a few words it represents our ' pool' or ' syndicate' into the treasury of which are now put, and *will hereafter* be put the stocks and bonds of all the companies in the project."  William Gilmor also signed a letter dated Feb. 6, 1890, and addressed to Lindenthal, which is very similar to the one written by Miller in the line of the " Sample letter."  Miller swore that it was also pepared by Lindenthal.  Du Puy testified that Lindenthal only showed him the letter of Gilmor and the statement, but Lindenthal's account of what he told Du Puy shows that he gave him sufficient information to inform any intelligent man that all the proposed plans of the company had not yet been accomplished.  But assuming that Du Puy was deceived and without meaning to be understood as attempting to justify all the statements in the " Prospectus," as it is called, I do think the conduct of Miller in sending it was not as reprehensible as it would have been if it had been sent to one unacquainted with the facts.  If we accept Lindenthal's evidence as true, there is no reason to suspect any collusion between him and Miller to impose on Du Puy or any one else.

There are undoubtedly assertions in that " Prospectus " that were not true and which one having a proper regard for his own reputation or the rights of others should not have made, but there is not sufficient evidence in the case to enable me to reach the conclusion that any officer of the company had anything to do with its issue.  It was not

properly speaking a " Prospectus." It did not profess to be issued by the company and only two or three typewritten copies were ever made, so far as the evidence discloses, and the one sent to Lindenthal by Miller is the only one shown to have been sent to anyone. Mr. Gilmor, who is president of the company, swore concerning it, " I hadn't any part in the preparation of that paper and hadn't any knowledge of its preparation; it was not issued to my knowledge by the Transportation and Terminal Company, nor ordered by it to be issued; I hadn't any knowledge that it had been placed in the hands of Mr. Lindenthal, or that Mr. Lindenthal had exhibited it to Mr. Du Puy." That statement of his stands uncontradicted and it is therefore unjust to infer any connection with it by him. Both Gilmor and Miller swore that the gentlemen whose names are mentioned in it as officers and directors of the company had consented to serve as such, and if that was not true it would have been an easy matter to contradict them, as many of the parties named lived in Baltimore and all could have been reached, but that was not attempted. In justice to Miller it is proper to say that he swore that the statement was made with reference to what was expected to be done by the company when fully organized and when all was accomplished that they expected and believed they would do, although, as I stated above, the condition of affairs at the time the statement was made did not justify many of the assertions contained in it.

In regard to the two receipts for $30,000, each signed by Gilmor, he swore that he signed them at the request of Lindenthal and because he believed the option therein contained was valuable to the company, " that if the project had gone on to the successful issue it then promised, that this $80,000 worth of preferred stock in my mind would have been worth considerable more money, and therefore I considered it a valuable privilege." If, in point of fact, the object for which the company was organized had been accomplished, which was to secure terminal facilities and rail-

road connections in the city of Baltimore and to enter the anthracite coal regions in Pennsylvania, it was certainly not beyond a reasonable expectation that the preferred stock of the company would become valuable.  Lindenthal, Miller, Gilmor and Case all testified they believed the enterprise would be successful.  Lindenthal gave the two checks of Anderson, Du Puy & Co., which he had received from Du Puy for $30,000 each, to Miller, who was not an officer, but only a stockholder in the company, and he also paid Miller for the stock he got himself by cancelling a debt of $15,000 Miller owed him.  Miller had already subscribed for the whole of the 15,000 shares of first preferred stock which had been authorized to be issued and the money did not go to the company.  It is true that Miller gave Gilmor one of the checks for $30,000 out of which the latter paid himself $10,000 for a debt due him by the former and then paid the balance to Miller.  Both of them explain that the check was given to Gilmor because Miller had no bank account in Baltimore.  If in point of fact the stock belonged to the company, it might well be questioned whether Du Puy had any just claim against it as Lindenthal, who was either acting for himself or Du Puy in that part of the transaction, did not pay the money to the company or any of its agents but to Miller, and paid for his own stock by crediting Miller with the amount due by him.  If Miller owed Gilmor $10,000, which is not contradicted by any evidence, he certainly had as much right to pay himself out of the check as Lindenthal had to pay himself with stock that belonged to the company, if the theory of the plaintiffs that the stock was the company's be correct.

For these reasons and others that might be given, it cannot in my opinion be properly said or necessarily inferred that there was a scheme to deceive and " to entrap the credulous and unsuspecting," or that the president or other officer of the company is shown to be connected with the scheme, if such existed.  There is no evidence in the rec-

ord that permits me to say or infer that nearly half a million dollars was realized by the sale of stock or " went into the pockets of the enterprising and speculative promoters." Although the bill was filed May 15, 1891, by Mr. and Mrs. Dupuy for themselves and on behalf of other stockholders who might become parties to the suit, the record fails to disclose that any other person has appeared or complained. So far as Gilmor is concerned, he swore he never got one dollar from the company—not even his salary—and without some evidence or something in the record to fairly sustain the contrary, I must assume his statement to be correct.

In regard to the execution of the deed of trust and the transactions thereafter, it is manifest that some things were done which ought not to have been done under the circumstances. The stock of the Maryland Central Railway Company and of the Deer Creek and Susquehanna Railroad ought not to have been surrendered to Miller. It may be true that at the time they were of little, if any, value, but if they were valuable to Miller they might have been to the company and were certainly as much so as the stock of the Terminal Company when the arrangement was made. But it does not necessarily follow that it was done with a fraudulent intent. It is not shown that Taylor, the trustee, knew of the transactions with the Du Puys, and if Miller and those associated with him were the only parties interested there could have been no serious objection to returning this stock to him. The transaction by the trustee was approved of by the Court, and although it was an *ex parte* proceeding, it is not probable it would have been done in that public way if there had been any fraudulent intent. It could have been much more readily concealed if the transfer had been made before the execution of the deed of trust, and if the design was to defraud any of the stockholders or others, it is difficult to understand why they waited until after the deed of trust was executed and thus make the transaction a matter of public record. Nor do I think the fact of the

sale of the other property to Blick is conclusive evidence of fraud. If there was any fraudulent design in that, it seems rather remarkable that one so closely connected with Mr. Gilmor was selected as the purchaser. With such an intent it is more likely they would have chosen some stranger or at least some one not so near the parties interested in the company. It may be, and doubtless was true that Blick could not furnish so much purchase money without the help of others, but if the trustee felt assured that the money or its equivalent would be paid, there was no great impropriety in his reporting the sale to Blick. His bond was responsible for the amount of cash he charged himself with and no stockholder or creditor could suffer merely because he reported the sale to a purchaser of the financial standing of Blick. If the claims filed by the creditors of the company were honestly due, there is no reason why they should not have been paid, and if the trustee was willing to take the risk of charging himself with the cash and accepting the releases of the creditors, it by no means follows that he was guilty of fraud by doing so. It is not an unusual thing for a trustee or an attorney named in a mortgage to sell property to the mortgagee or other creditor, and not require him to pay more of the purchase money than is necessary to cover the expenses. Of course he takes the risk of having the claims of the creditors rejected, but it would be a harsh ruling to brand the trustee with intentional fraud merely because he charged himself with the money as if cash had been actually paid. The allowance of commissions on the whole sum was improper and should not have been made in the audit, but if commissions had only been allowed on the thirty-five thousand dollars instead of on the one hundred and twenty-one thousand, there would still have been a deficiency if the claims filed are correct. There is no evidence that the property sold to Blick did not bring a fair price.

I think that the transactions were of such a character as to justify the intervention of a Court of Equity by the ap-

pointment of a receiver, so as to have them thoroughly investigated—especially as the only creditors who filed claims were so closely connected with the company. But I cannot, in advance of such investigations by a receiver and of a full opportunity for explanations by the parties, agree to condemn them and pronounce them guilty of actual fraud when I see that their conduct may be explained and shown to be free of any intentional fraud.

Fraud, when clearly proven or fairly inferrible, should be fearlessly condemned, but never presumed or charged unless fully justified by the facts before the Court.

As I believe many of the transactions so seriously criticised in the opinion of the majority of the Court are capable of explanation on grounds other than fraud, I have thought it but just to thus refer to some of them.

I am authorized to say that JUDGE FOWLER concurs in this opinion.

(Filed April 10th, 1896.)