## BARCUS et al. v. GATES et al.

### (Circuit Court of Appeals, Fourth Circuit. November 1, 1898.)

#### No. 271.

1. CORPORATIONS—ISSUANCE OF STOCK—STATUTE REQUIRING FULL PAYMENT.

The effect of the statutes of Virginia relating to stock in corporations, in providing that shares shall not be sold to subscribers for less than their par value, is simply to render any agreement between the corporation and the stockholder ineffective to relieve the latter from full accountability, to the extent of the par value of his stock, in favor of creditors of the corporation.

2. SAME—EFFECT OF ISSUANCE OF STOCK FOR LESS THAN PAR.

In the absence of a statute inflicting a penalty for issuing or receiving stock in a corporation for which less than its par value has been paid, such action is not fraudulent, and does not involve moral turpitude, which will deprive the stockholder of a standing in a court of equity, to ask a rescission of the contract of subscription, and a dissolution of the corporation, on the ground that it was fraudulently conceived by its promoters for the purpose of deceiving and defrauding certain stockholders.

3. SAME—CONTRACT OF SUBSCRIPTION—RESCISSION FOR FRAUD.

A court of equity has jurisdiction to afford relief to one who has been induced, through the fraud of the promoters of a corporation, to become a subscriber to its stock, and may rescind the contract, though fully executed, and compel restitution.

4. EQUITY—PLEADING—MULTIFARIOUSNESS.

A bill is not multifarious because there are several causes of action stated, if they grow out of the same transaction, and all the defendants are interested in the same right, and the relief against each is of the same general character.

5. SAME—SUIT BY STOCKHOLDER FOR FRAUD—RELIEF AGAINST OTHER STOCKHOLDERS.

A bill was filed by stockholders in a corporation against the corporation and other stockholders, alleging that the latter fraudulently promoted and organized the corporation for the purpose of selling to it, at a grossly excessive valuation, certain land owned by them, which they falsely represented to be valuable for its purposes, but which in fact, as they knew, was worthless for such purposes and of very little value for any; that complainants were induced by such fraudulent representations to become subscribers to the stock of the corporation, and paid for such stock, and the amount so paid was withdrawn by the defendant stockholders in payment for said land. The bill prayed, as relief, that the corporation be adjudged insolvent and dissolved; that a receiver be appointed, and its property distributed after paying its debts; that the contracts of subscription of complainants be rescinded, and the remainder due them thereon, after distribution of the property of the corporation, be recovered from defendant stockholders. *Held*, that such bill was not multifarious, all the rights claimed and relief demanded being based on the same fraudulent scheme on the part of the individual defendants.

6. CORPORATIONS—SUIT BY STOCKHOLDERS—CONDITION PRECEDENT.

No demand by a stockholder on the officers of a corporation to bring a suit against another stockholder is required, under equity rule 94, to enable the stockholder to maintain a suit in his own name, when the right of action is one which the corporation could not enforce in its entirety.

Appeal from the Circuit Court of the United States for the Eastern District of Virginia.

This is an appeal from a decree sustaining the defendants' demurrer and dismissing the bill of complaint. The complainants

are James Q. Barcus, Henry A. Horton, Richard A. Edwards, and John M. Thompson, citizens of Indiana, and the defendants are Erasmus W. Gates, Joseph P. Hubbard, Robert E. Craig, the Virginia Marl Phosphate Company, and the American Plant-Food Company, all citizens of Virginia. The facts alleged in the bill of complaint, and admitted by the demurrer, are numerous, and are set out with substantial accuracy in the following statement found in the appellants' brief:

"On the 19th day of January, 1897, the appellants filed their bill of complaint in the circuit court for the Eastern district of Virginia, which, after alleging the necessary formal averments to give the court jurisdiction, alleged that on the 15th day of October, 1894, and up to the 6th day of February, 1895, the defendant Virginia Marl Phosphate Company was the owner of nine hundred and ninety-four and $26/100$ acres of land in New Kent county, in the state of Virginia, which real estate is fully described in the bill of complaint. And on said 15th day of October, 1894, the bill alleges that the defendants Gates, Hubbard, Craig, and Lefew, with three others, were the sole and only stockholders of the Virginia Marl Phosphate Company, and that said last-named defendants, with one Quarles, constituted its full board of directors, and that on said day said Virginia Marl Phosphate Company had ceased active operations, owed no indebtedness, and held said real estate as its only asset on behalf of said stockholders. That the defendant Thomas B. Henley, on the said 15th day of October, 1894, was a resident of West Point, in said state, and his only business was the promoting of corporations. That on the said 15th day of October, 1894, said defendant stockholders were desirous of having a sale made of said lands for the purchase of which they had, on the 3d day of January, 1889, organized said company, for the reason that, after operating and working the alleged phosphate deposits between 1889 and 1894, they had found that said lands were worthless so far as yielding phosphate; and, further, that on said 15th day of October, 1894, said defendant stockholders knew, from expert analyses, that said lands were suitable for farming purposes only, and that a fair cash value for said lands was not to exceed ten dollars per acre. The bill further shows that on said 15th day of October, 1894, the above-named defendant Thomas B. Henley was thoroughly acquainted with the character of said lands. That on said 15th day of October, 1894, said above-named defendants Gates, Hubbard, Craig, Lefew, and Henley combined and confederated together for the purpose of selling said lands at an excessive value, and also to obtain large amounts of the capital stock of a corporation which they proposed to organize for the purpose of effecting such sale. That said Henley was to act as the agent of the parties, and to do all the active work, and, to assist him in carrying out the plan agreed upon, the board of directors passed a resolution of sale, set out later in the bill. That thereupon said Henley immediately employed certain New York and Cincinnati expert chemists to take samples of soil from said land, and analyze them, and make written analyses. That on such occasions Henley went with said chemists to said lands, and changed the samples taken by said chemists by substituting samples of his own preparation, without the knowledge of said chemists, so that when said written analyses were made they showed that the soil of said lands contained from 12 to 16 per cent. of phosphoric acid. That, upon said Henley obtaining said written analyses, he induced one James N. Huston, a well-known and wealthy citizen of Indiana and a personal friend of the appellants, to become interested with him, and said Huston brought about a meeting between said Henley and all of said appellants, in the city of Indianapolis, about the 15th day of November, 1894, at which meeting, and at subsequent meetings between that day and the 1st day of January, 1895, said Henley made to appellants and said Huston representations that the soil of said land contained from 12 to 16 per cent. of phosphoric acid. That all that was necessary to make the same a commercial property was to dig, dry, sift, and bag it, and it was unnecessary to treat such soil by a chemical mixture of any extraneous fertilizing material. That the said

lands were owned by said above-named defendant stockholders, and that they were all gentlemen of wealth, honorable, and held high social positions in the city of Richmond, Va., and that each, being actively engaged in his private business, was unable to give the necessary time and attention to developing these properties, but that they were willing to sell a seven-fifteenth interest, retaining an eight-fifteenth interest, providing a corporation could be formed on that basis, and that said defendants would agree that for the first year such corporation should have as officers and majority of directors such persons as would become interested with them, provided said Henley should be the general manager and should represent their interests. That said Henley at said meetings stated that his statements as to the quality of said lands were based upon the analyses made by said New York and Cincinnati chemists, which he produced at said meetings, and which analyses did corroborate his statements. That, on account of the valuable deposits on these lands, said associates of said Henley above mentioned were unwilling to sell for a less value than one hundred thousand dollars, and that they desired to form a corporation of one hundred and fifty thousand dollars preferred stock, divided into fifteen blocks, of ten thousand dollars each, of which the Virginia parties should hold eight blocks, and the Indiana parties seven blocks. That said corporation should also issue eight hundred and fifty thousand dollars of common stock, and that each holder of one block of preferred stock should receive twenty thousand dollars of common stock as a bonus, and that, for an assignment of certain options that Henley and his Virginia associates held on adjoining lands, they were to receive thirty thousand dollars of common stock, and that said Huston and said Henley for services rendered were to receive the remainder, consisting of two hundred and fifty thousand dollars of common stock. That all parties taking said preferred stock should pay therefor one-third cash and two-thirds in negotiable notes. That the land should be sold to the company on a basis of one-third cash and the balance payable in one and two years. That the preferred and common stock of each subscriber should be held in the treasury of the company as collateral security for the payment of notes given. That said Henley stated at said meetings that already his Virginia associates had been offered large sums of money for the entire title to said property, which they had refused to take, because they wished to retain an interest in the land. That said Henley further stated that, if applicants wished, he would accompany any expert chemist they might send to the lands and point them out to him. The bill then alleges that appellants accepted the offer of said Henley, and sent Henry A. Huston, then holding the office of state chemist of the state of Indiana, to examine said lands, draw samples, and make analysis, and that said Henley met him on said land, and, after said Huston had taken said samples, said Henley surreptitiously changed the samples as he had done to the New York and Cincinnati chemists, and that when said Huston analyzed said samples he found that the quality of the soil of said land was as represented by said Henley at said meetings in Indianapolis, and that it contained from 12 to 16 per cent. of phosphoric acid. The bill then shows that, upon the return of said Huston and said Henley to Indianapolis, the appellants and said Huston and said Henley entered into a written agreement, which is set out on pages 9, 10, 11, and 12 of the record, in accordance with the propositions made by said Henley as aforesaid. The bill then further shows that, as only ten blocks of the stock had been subscribed for, the appellants insisted that all of the fifteen blocks should be subscribed for and paid in; and that thereupon said Henley agreed to subscribe for two more blocks for his said Eastern associates, and said Huston agreed to subscribe for three more blocks, making the full subscription, said Huston stating at the time that he had effected an arrangement with the Eastern associates of said Henley allowing him to do so. The bill then states that such subscription by said Huston and said Henley was part and parcel of a corrupt agreement between said Henley, Huston, and the Eastern associates leading up to certain transactions set out later in the bill, which were carried out by said Huston on the one side, and said Gates and Henley on the other, on the 6th day of February, 1895, in the city of Richmond, Va. The bill then sets out two agreements, which

it alleges were material agreements, and without which they would not have signed their subscriptions, which two agreements were—First, that the tract of land could be purchased upon a basis of one-third cash and the balance of two-thirds evidenced by the new company's obligations, the Virginia Marl Phosphate Company at the time to give a bond for the conveyance; and, second, that each and all of said subscribers should pay into the treasury of said company one-third of their subscription in cash and the remaining two-thirds in their notes. The bill then shows that a final meeting was held on the 14th day of January, 1895, in the city of Indianapolis, of these appellants and said Huston and said Henley, and said Huston presented the application for the charter of the proposed American Plant-Food Company, and said Huston was authorized on behalf of appellants to close up the transaction of the purchase of the lands as heretofore mutually agreed upon; and said Huston was also authorized to receive payments from all parties on their stock subscriptions, and receipt in the name of the treasurer. The bill then shows that each of the appellants, between the 14th day of January, 1895, and the 6th day of February, 1895, paid to said Huston his one-third in cash and two-thirds in notes; that the said payments were made in good faith, and solely upon the agreement and understanding that said defendant stockholders above mentioned should make like payments. The bill then sets out that, in order to assist said Henley in his efforts in selling said property for fertilizing purposes, said defendants, as the directors of said Virginia Marl Phosphate Company as aforesaid, passed a resolution for the sale of said property to said Henley as aforesaid for the consideration of thirty thousand dollars and other valuable considerations, and that in said deed said Henley was the trustee of the defendant Virginia Marl Phosphate Company and said Gates, Hubbard, Lefew, and Craig. The bill then sets forth that on the 6th day of February, 1895, said Huston, Henley, and Gates met in the city of Richmond, and that these defendants, wholly disregarding the rights of the appellants under the agreement, closed the above transaction in an entirely different manner from that originally agreed upon, and went through a pretended purchase and sale of said property, whereby certain checks were given, and at once redelivered, without any intention of money passing, the full particulars of which are set forth in the printed record, and of which it is impossible to make a brief abstract. The bill then sets up that all the representations made by the said Henley were false, and made for the purpose of inducing the appellants to invest their money in worthless real estate; that the appellants, without any knowledge of the falsity of said representations, have paid in all the moneys due from them, aggregating the sum of forty thousand dollars, and that said defendants Gates, Hubbard, Lefew, and Craig have not paid any of their subscriptions; that the American Plant-Food Company is wholly insolvent, has no assets other than said above-described real estate, but has judgments against it amounting to twelve hundred dollars. The bill then states facts showing that the appellants had no knowledge of the falsity of the representations or of the doings in connection with said transaction until the 1st day of July, 1896, when it at once made investigations, and by their counsel demanded restitution of the moneys paid in, which has been refused, and that the appellants have not acquiesced in, or ratified any of, the fraudulent acts of said defendants.

"The prayer for relief asks: First. That an account may be taken of all moneys paid into the treasury of the American Plant-Food Company by the appellants and appellees, and of all the dealings and transactions of said appellees with reference to the sale of said Northbury tract, and that the respective rights of the appellees be ascertained and established. Second. That the contract of subscription of the appellants to the American Plant-Food Company be rescinded and canceled. Third. That the lien reserved by the appellee Virginia Marl Phosphate Company be declared and decreed fraudulent, null, and void, and the same canceled. Fourth. That an account be taken of the assets and liabilities of the American Plant-Food Company, and that it be declared and decreed to be insolvent. Fifth. That a decree be rendered against each of the appellees in favor of the appellants for such sum as may be found to have been paid by them into the treasury of the said

American Plant-Food Company. Sixth. That such sum so found and decreed to be due be declared a lien on said real estate, and that said land be ordered and decreed to be sold, and the proceeds to be applied as follows: (1) To the payment of any indebtedness of the American Plant-Food Company; (2) to the payment of these appellants. Seventh. That, in case of any deficiency, a judgment over be rendered against each of said appellees. Eighth. That a receiver be appointed. Ninth. Prayer for general relief.

"The appellees, with the exception of the American Plant-Food Company, all entered a general appearance to the bill, and on the 5th day of April, 1897, filed a demurrer. The demurrer was set down for argument, and on the 24th day of January, 1898, the court below, without stating the reasons for its action, held that the demurrer was well taken, and entered a decree that the demurrer be sustained, and that the bill be dismissed."

L. D. Yarrell (John B. Sherwood, on brief), for appellants.
John Pickrell and Frank W. Christian, for appellees.

Before GOFF and SIMONTON, Circuit Judges, and MORRIS, District Judge.

MORRIS, District Judge (after stating the facts as above). The ground of demurrer most strongly relied upon is that the appellants cannot be heard to complain of the frauds by which they were induced to part with their money in the formation of the American Plant-Food Company and the purchase of the Northbury tract of land, because the agreement, to which they were parties, for the subscriptions to the stock of the American Plant-Food Company, was contrary to the public policy of Virginia, and illegal under its laws, for the reason that the common stock was to be issued without being paid for. The scheme was that the total capital stock should be $1,000,000, in shares of $100 each. Of this, $150,-000 were to be preferred shares, to be paid for in full. The remaining 8,500 shares were to be common stock, of which $300,000 were to be given to the subscribers to the preferred shares as a bonus; $300,000 of common stock were to be set aside to Henley and his associates as consideration for certain options on adjoining lands, and $250.000 of common stock to be set aside for Henley as consideration for his services.

The original agreement set out in the bill of complaint was for an incorporation under the laws of West Virginia, but afterwards the company, by consent of all the parties, was incorporated under the general laws of the state of Virginia, on January 19, 1895. The articles of incorporation named Huston as president and Henley as general manager, and provided, among other things, that, "when said capital stock has been fully subscribed, the said company may commence business"; and also provided that nothing but money should be received in payment of subscriptions to stock, except upon a fair estimate of actual value, to be agreed upon between the corporation and the stockholders previous to subscription.

With regard to payment for shares of stock, the Virginia Code of 1887 enacts:

"Sec. 1107. Upon every subscription for shares in any joint stock company, there shall be paid upon each share two dollars at the time of subscribing, and the residue thereof as required by the president and directors."

"Sec. 1124. Immediately after the election of president and directors, the

books for receiving subscriptions shall be delivered to them. If the whole capital stock has not been subscribed, they shall take measures for obtaining subscriptions of the residue. They shall not, to obtain such subscriptions, sell the stock at less than par, but may fix the price of such residue at a premium, which shall be for the benefit of all the stockholders ratably."

Sections 1127 and 1129 provide how the money to be paid for shares may be recovered, if not paid as required by the president and directors; and section 1130 provides that, without the consent of the company, no stock may be transferred on its books until all the money payable thereon has been paid, and that on any assignment the assignee and the assignor shall be severally liable for any installments which have accrued or may thereafter accrue. An act approved December 19, 1895 (Acts Assem. 1895–96, p. 25), further provides a proceeding to recover unpaid subscriptions. It will thus be seen that the statute law of Virginia is, in substance, merely declaratory of the general rule of law that the subscribing stockholders of a corporation cannot be relieved from payment of the subscription price of their shares. As between the corporation and the stockholders, there does not seem by the Virginia law to be anything to prevent an agreement that the payment may be by installments, and be postponed as long as they agree, provided, always, that, if creditors intervene, the unpaid installments may be required to be paid in to satisfy the debts of the corporation.

By the Virginia statute there is no prohibition enacted or penalty imposed, except that imposed by the general law, namely, that creditors may require the whole nominal value of the shares to be paid in, and that any agreement between the corporation and the stockholders, limiting their liability therefor, is void as against creditors. This is simply the general doctrine repeatedly declared by the supreme court of the United States and other courts. There is no public policy with respect to the payment for shares by stockholders declared by Virginia statute different from other states, and, indeed, the Virginia statutes are not as rigorous as those of many other states. Handley v. Stutz, 139 U. S. 417–427, 11 Sup. Ct. 530.

In the absence of a statute inflicting a penalty of some sort for issuing or receiving, as fully paid and nonassessable, shares for which less than their face value had been paid, or prohibiting its being done, we are not aware of any general principle which holds such a transaction to be fraudulent, or of moral turpitude, so as to prevent a party to such an act from having any standing in a court of equity. The penalty is that the stockholders to whom such shares are issued may be called upon, not, indeed, to pay their entire par value, but so much thereof as may be required to pay those creditors who had a right to look to the capital stock as a fund for the payment of their debts. Agreements not to require payment for stocks issued have been regarded by the courts not as questions affected by public policy, but as questions between debtor and creditor, as to which each is controlled by the ordinary rules of law.

Thus, in Martin v. Land Co. (1897) 26 S. E. 591, in a case where the corporation had agreed that not more than 30 per cent. of

the stock subscription should ever be called in, the supreme court of Virginia held that a creditor, who dealt with the company with full knowledge of this agreement, was estopped from calling upon stockholders to pay more than the 30 per cent.

In the supreme court of the United States Clark v. Bever, 139 U. S. 96, 11 Sup. Ct. 468, Fogg v. Blair, 139 U. S. 118, 11 Sup. Ct. 476, and Handley v. Stutz, 139 U. S. 417, 11 Sup. Ct. 530, are all cases in which the court, while recognizing the general principle that stockholders are bound to account for the face value of stock subscribed for, still held that the stockholder might exempt himself from full payment by showing that it was agreed that he should not be called upon to pay, and that he acquired his stock under circumstances that did not give creditors and other stockholders just ground to complain of such an agreement.

In Camden v. Stuart, 144 U. S. 104–113, 12 Sup. Ct. 585, the supreme court again declared that, while it might be unavailing as against the claims of creditors, any settlement or satisfaction of the stock subscription might be good as between the corporation and stockholders.

In Maryland, where the statute provides that unless capital stock shall be paid in within a prescribed time, the corporation may be dissolved, it was held in Brant v. Ehlen, 59 Md. 1, that the purchaser of shares issued as full paid in good faith cannot be held liable to a creditor of the corporation as for unpaid installments.

It is sometimes said that issuing full-paid stock without full payment is ultra vires, by which is meant, when not in excess of the number of shares fixed by the charter, not that the stock is invalid or that the holder is not a stockholder, but that the act is ineffectual as against creditors of the company, and may be held in fraud of the rights of other stockholders. Sawyer v. Hoag, 17 Wall. 610.

In Scovill v. Thayer, 105 U. S. 143, while holding that stock issued in excess of the limit fixed by the charter was void, the court said (page 153) with regard to the stock not in excess of the limit:

"The stock held by the defendant was evidenced by certificates of full-paid shares. It is conceded to have been the contract between him and the company that he should never be called upon to pay any further assessments upon it. The same contract was made with all the other shareholders, and the fact was known to all. As between them and the company, this was a perfectly valid agreement. It was not forbidden by the charter or by any law or public policy, and, as between the company and the stockholders, was just as binding as if it had been expressly authorized by the charter. * * * The shares were issued as full paid, on a fair understanding, and that bound the company." "In fact, it has been held in recent English cases that not only is the company bound, but its creditors also are bound, by such a contract. * * * But the doctrine of this court is that such a contract, though binding on the company, is a fraud in law on its creditors, which they can set aside; that when their rights intervene, and their claims are to be satisfied, the stockholders can be required to pay their stock in full."

The attitude of the four Indiana complainants in the present case is that they agreed to pay, and have paid, into the American Plant-Food Company, each the sum of $10,000 in money, for 100

shares each of the preferred shares of that corporation, and each received besides, as a bonus, 200 shares of the common stock. In doing this they have done nothing prohibited by the Virginia statute. What they have done is to make themselves liable to the extent of the unpaid shares accepted by them to such of the creditors of the company as may have trusted the company upon the faith of its nominal capital. It seems to us that it would be new doctrine to hold that because a stockholder has not paid up in full for all the stock held by him, or because he had consented to an agreement by which stock was issued to him and others without payment, he could have no standing in court to assert any right he might have against the corporation or its other members, or those who promoted it.

It is to be noticed that the present suit is not to enforce any rights obtained by the supposed illegal act of the company in issuing unpaid stock as full paid, or the agreement, to which the complainants were parties, stipulating that stock should be so issued, but, on the contrary, is in disaffirmance of that whole transaction. The bill seeks the dissolution and winding up of the American Plant-Food Company, and the canceling of all its stock as a corporation contrived by the promoters for a fraudulent purpose, into which the complainants were tricked by the defendants charged in the bill.

In Central Transp. Co. v. Pullman's Palace-Car Co., 139 U. S. 24–60, 11 Sup. Ct. 478, 488, the court said:

"A contract ultra vires being unlawful and void, not because it is in itself immoral, but because the corporation, by the law of its creation, is incapable of making it, the courts, while refusing to maintain any action upon the unlawful contract, have always striven to do justice between the parties, so far as could be done consistently with the adherence to law, by permitting property or money parted with on the faith of the unlawful contract to be recovered back or compensation to be made for it. * * * To maintain such an action is not to affirm, but to disaffirm, the unlawful contract."

Parkersburg v. Brown, 106 U. S. 487–503, 1 Sup. Ct. 442, is to the same effect.

In Du Puy v. Terminal Co., 82 Md. 408, 33 Atl. 889, and 34 Atl. 910, the complainant had been induced by fraudulent representations of the promoters of a corporation to pay $60,000 for 800 shares of preferred stock of the par value of $80,000, together with 800 shares of common stock of the same par value, and a bill in equity was sustained to unravel the frauds by which the promoters had deceived and cheated the other stockholders. It was not considered that the stockholder was under any disability because he had the stock issued to him for about one-third of its par value, although, as has been already stated, the Maryland statutes are more exacting with regard to payment of the full par value of stock than those of Virginia.

If there be no reason on the ground of public policy, and we think there is none, to prevent the complainants asserting their rights, there can be no question of the jurisdiction in equity. In Cook on Stock and Stockholders the author, in discussing the five different remedies which are open to a subscriber induced to

subscribe to stock by fraud, states (section 155) that the remedy by bill in equity is the fairest, safest, and most complete remedy the subscriber has; that it is a customary remedy in England, and has been clearly upheld in this country. It was the remedy pursued in Tyler v. Savage, 143 U. S. 79, 12 Sup. Ct. 340.

In Motor Co. v. Purnell, 75 Md. 113, 23 Atl. 134, at page 120, 75 Md., and page 136, 23 Atl., the court said:

"It is now settled that, where a subscriber to stock has been deceived and induced to enter into a contract of subscription by misrepresentation and fraud of an agent acting for the corporation, such contract, while not absolutely void, is voidable at the election of the party deceived, and he will be entitled to have the contract of subscription rescinded and declared void, and to have restitution made of all money paid thereon, provided he elects to repudiate the contract at once upon discovery of the fraud, and he is guilty of no unnecessary delay in coming to a court of equity for relief. This relief will be afforded even after the complete execution of the contract, if the rights of creditors or of innocent third parties do not intervene and give rise to equities superior to those of the stockholder alleging himself to have been defrauded."

But even if, under a proper bill of complaint, equity might have jurisdiction, the appellees contend that this bill is multifarious, in that it embraces inconsistent causes of action and inconsistent prayers for relief. The inconsistent causes of action are said to be that, while these complainants allege that their subscriptions were obtained by fraud, they affirm those subscriptions by contending that the American Plant-Food Company was defrauded in the purchase of the Northbury tract, and asking to have that purchase canceled and the purchase money refunded; that they are attempting to assert rights as stockholders and also as creditors of the American Plant-Food Company; and the inconsistent prayers for relief are said to be a recovery against the Virginia Marl Phosphate Company and those persons, who, co-operating with it, deceived the complainants, and also a prayer as against the American Plant-Food Company to have their subscriptions rescinded.

Multifariousness arises from the fact either that the transactions which form the subject-matter of the suit are so separate and dissimilar that they cannot conveniently be tried in one record, or that some defendant is able to say that as to a large part of the transaction set out in the bill he has no interest or connection whatever. A bill is not multifarious because there are several causes of action, if they grow out of the same transaction, and if all the defendants are interested in the same rights, and the relief against each is of the same general character, the bill may be sustained. Brown v. Safe-Deposit Co., 128 U. S. 403, 9 Sup. Ct. 127.

In this case the allegation is that the individual defendants owning and controlling the Virginia Marl Phosphate Company, and knowing the Northbury tract of land to be worthless as a deposit of phosphate fertilizer, and having abandoned its operation because they had found it to be worthless, constituted Henley their agent to exploit a scheme by which the tract should be sold to a new company, at an excessive valuation, by means of fraudulent representation as to its character; that Henley carried out his

employment by substituting doctored samples of the soil, and imposing upon the chemists who certified as to the character of the soil, and in pursuance of the scheme the individual defendants appropriated to their own use the money paid in by the complainants, while they themselves, by a trick, escaped from paying anything for their own stock which they received in the American Plant-Food Company, and that they improperly reserved a lien for $27,-000, part of the purchase money, in the deed from the Virginia Marl Phosphate Company to the American Plant-Food Company. The complainants allege that this was all one scheme, of which the incorporating of the American Plant-Food Company was part. The allegations make it one continuous transaction, having one purpose.

The case of Ashmead v. Colby, 26 Conn. 287, was similar in its facts to those alleged in the present bill. It was a "salted" gold mine in Virginia, to purchase which the complainants had been fraudulently induced to form a Virginia corporation and subscribe for stock. The bill sought the cancellation of the stock subscriptions, the cancellation of the notes given for the purchase of the supposed mine, and a decree for the repayment of the money paid to the parties who conspired to effect the fraudulent sale. The supreme court of Connecticut held that the bill was not multifarious, saying:

"The defendants prepetrated the fraud by means of inducing the individuals who are plaintiffs to take capital stock of the corporation and advance their money for it, that the money might be immediately withdrawn from the corporation for the benefit of the defendants under the form of a purchase of a valuable property suited to the objects of the corporation, but in fact of very little value for any purpose compared with the price for which it was sold, and of none whatever for the purpose for which it was purchased. The corporation was used, therefore, as a mere instrument by which to accomplish the design, and it was to defraud both it and the individuals induced to take its stock that the whole series of fraudulent representations were made. It is therefore substantially a case where certain individuals, together with a corporation, are all defrauded by one act or series of acts designed to accomplish the same fraud, and this fraud operates very much in the same way both upon the individuals and the corporation. It takes the money of the individuals to fill the stock of the corporation, and then withdraws it from the corporation for the benefit of the parties perpetrating the fraud."

In Bosher v. Land Co., 89 Va. 455, 16 S. E. 360, it was held by the supreme court of Virginia that all the stockholders who had been induced to subscribe to stock by fraudulent representations of the promoters of the corporation could file a bill on their own behalf, and on behalf of all others similarly deceived, to rescind their subscriptions as against the corporation, and against the promoters to have the amounts paid on their stock repaid. It was held that the bill was not multifarious, that the complainants were properly joined, and that parties who fraudulently received the proceeds of the sale to the corporation could be decreed to make restitution to the parties whose money they obtained. The rule stated in Salvige v. Hyde, 5 Mass. 146, is:

"If the object of the suit be single, but it happens that different persons have separate interests in distinct questions which arise out of that single

object, it necessarily follows that such different persons must be brought before the court, in order that the suit may conclude the whole object."

It is true that in Brown v. Improvement Co., 91 Va. 31, 20 S. E. 968, in a case similar in its facts to Bosher v. Land Co., 89 Va. 455, 16 S. E. 360, above cited, the supreme court of Virginia held that where the deluded stockholders filed their bill on their own behalf, and also on behalf of such creditors of the corporation who should come in and join in the suit, the bill was multifarious, for the reason that the interests of the complaining stockholders seeking a rescission of their subscriptions would be opposed to the interests of the complaining creditors. This technical difficulty does not attach to this case, as creditors are not made parties.

It is true that, as was just and equitable, the complainants asked as part of the relief prayed that any indebtedness of the American Plant-Food Company might be ascertained and paid, and the corporation be decreed to be insolvent, and that a receiver of the land sold to the American Plant-Food Company be appointed. But this relief, as well as the other relief asked, was required to do full equity in the case. In any proceeding the result of which must involve dissolution of a corporation, and the practical winding up of its affairs, the court usually calls before it the various claimants having interests in its assets, and adjudicates their various claims and priorities. It is the peculiar office of equity to deal with suits of this character, and its machinery is adapted to settle conflicts between different sets of claimants without embarrassment. It is only in equity, and in a case in which creditors may assert their claims as well as stockholders, that the rights of defrauded stockholders can be worked out without injustice to creditors when the corporation is insolvent. As was said in Oliver v. Piatt, 3 How. 333–411, it is generally an answer to the objection of multifariousness in a case of clear equitable jurisdiction that the transactions had so mingled the interests of the defendants that entire justice cannot conveniently be done, and a final and conclusive decree touching all their interests could not be made, without joining them all. We think this is peculiarly such a case.

It is further urged in support of the demurrer that the complainants have failed to comply with the ninety-fourth rule in equity with regard to stockholders' bills founded upon rights which may be properly asserted by the corporation. This is a case in which the claim of the complainants to be refunded by the individual defendants the amounts paid for their stock could not be asserted by the corporation. It is not a case contemplated by rule 94, in which a minority of stockholders proceed to enforce a right which the corporation might enforce. or in which there could be a collusive agreement to give the federal court jurisdiction. Here the complainants, citizens of Indiana, allege that they were original subscribers; that they are the only stockholders who have contributed anything of value to the corporation; who alleged that the corporation was fraudulently chartered to accomplish a fraudulent purpose; that it cannot continue a going concern for any honest object, but that it ought to be dissolved, its debts paid, and its

.existence terminated. In such a case it would be nugatory to say that a suit could not be instituted without first calling upon its directors to take action in the premises. The judgment is reversed, and the case remanded, with directions to overrule the demurrer.