### McMULLEN LUMBER CO. v. STROTHER et al.

(Circuit Court of Appeals, Eighth Circuit. March 24, 1905.)

No. 2,114.

**1. BILLS OF DISCOVERY**

While bills of discovery in the state courts are measurably discountenanced in view of the Codes authorizing the examination under deposition de bene esse of the defendant, and the compulsory production of books and papers in his possession or under his control, such Code provisions are aids to the methods of procedure in the federal courts in actions at law, but are not entire substitutes for bills of discovery and relief in equity in federal practice.

**2. SAME.**

So where, under contracts for the sale and delivery of large quantities of lumber of different qualities and varying dimensions, at designated places, the vendee being a nonresident of the state from that of the place of delivery, and for his better protection against mistakes or frauds of the vendor he puts an authorized agent at the place of delivery to inspect the lumber and keep memoranda thereof, but the vendor fraudulently, with the use of intoxicating liquors, renders such agent subservient to his will, or renders the protection to the vendee unavailing, whereby the evidence of the quantity and quality of the lumber delivered is especially in the breast and keeping of the vendor, a bill of discovery will lie in a suit for accounting against the vendor.

**3. ACCOUNTING IN EQUITY.**

Mutuality of accounts, as in case of debits and credits between the parties, is not always essential to confer jurisdiction in equity. As such

jurisdiction attaches in the instances of mutual accounts because of their intricate and complicated character the singleness of the accounts to be rendered should come equally within the jurisdiction of equity where the requisite intricacy and complications exist.

**4. SAME—THE RIGHT OF REFERENCE.**

As the federal courts are unauthorized in actions at law to refer the matter of complicated accounts to a referee, it should follow that whenever, under the state Code, such reference could properly be made, a suit in equity should lie in the federal courts to enable the chancellor to refer such matter to a master in chancery.

**5. SAME—ADEQUATE REMEDY AT LAW.**

The test of the adequate remedy at law prescribed by the federal statute is that, unless the remedy at law be "as practical and efficient to the ends of justice and its prompt administration as the remedy in equity," resort may be had to the equity side of the court.

[Ed. Note.—For cases in point, see vol. 19, Cent. Dig. Equity, § 152.]

**6. SAME.**

The fact that some of the matters complained of in the bill, independently considered, might well be tried at law, is not sufficient to oust jurisdition in equity where it attaches as to other matters of accounting arising under the same contracts. The court, having obtained jurisdiction over material parts of such accounting, will retain the same for the adjustment of all the rights and interests of the parties connected therewith. So where a part of the unascertained amount of the funds to be accounted for by the defendant party to the contract has been surreptitiously invested by such defendant and his co-conspirator in real estate, jurisdiction in equity attaches to declare the legal title held as under an implied trust for the rightful owners of the fund, according to him his option to take the property in kind or to enforce an equitable lien thereon to the extent of the fund diverted.

**7. SAME—MULTIFARIOUSNESS.**

A bill is not multifarious which seeks to have an accounting on contracts with one of the defendants, where another defendant is joined under allegations that the two have wrongfully taken the funds equitably belonging to the complainant, and fraudulently sought to cover them up by investing them in lands, taking the legal title thereto in themselves, and the bill seeks to fasten a trust thereon for the use of the complainant.

[Ed. Note.—For cases in point, see vol. 19, Cent. Dig. Equity, §§ 371–373.]

(Syllabus by the Court.)

Appeal from the Circuit Court of the United States for the Eastern District of Missouri.

As the case was determined in the court below on demurrer to the bill on the ground that it did not state facts sufficient to entitle the complainant to a standing in a court of equity, it becomes necessary to set out the substantive allegations of the bill. From March, 1901, to January 1, 1902, Herbert Y. McMullen, Frederic B. McMullen, and George W. McMullen, citizens of the state of Illinois, residing at Chicago, were copartners under the firm name of McMullen Lumber Company. In the latter part of 1901 said partners formed a corporation under the laws of Illinois under the corporate name of McMullen Lumber Company (the complainant herein), and all of the assets and property of said copartnership were transferred to said corporation, which succeeded to the business and rights of said copartnership. On or about the 9th day of March, 1901, the defendant Strother, residing in Southeastern Missouri, entered into a contract with one D. S. McMullen, as the agent and representative of the McMullen Lumber Company; under the control of said partnership, which contract was understood by all the parties to be for the benefit of said copartnership, and which was transferred to said copartnership, and was afterwards transferred to the complainant corporation. By

said contract said Strother sold and agreed to deliver to said **D. S. McMullen** and his assigns, and to stack and pile in the lumber yards of the said company adjacent to the mills therein referred to, the entire cut and output of oak, ash, and cottonwood lumber from two certain sawmills operated by said Strother on ground leased by him known as the "White" or "Cannon" mill and the "Michael," "Cowskin," or "Lower" mill, to be sawed between April 2, 1901, and January 2, 1902, at certain prices per thousand feet; as scheduled in the contract. (The different kinds of lumber and the amount per thousand feet are set out.) The contract provided that whenever the lumber should be put or placed in said yard or yards the title thereto should at once vest in said D. S. McMullen, his legal representatives or assigns. The lumber was to be graded and measured as delivered by the inspector of the company, according to the rules of the National Hardwood Association. Payment for the lumber delivered was to be made to said Strother every 15 days, less $2 for each thousand feet of lumber sawed and delivered, which it was agreed said D. S. McMullen, his representatives and assigns, should retain to insure the hauling and loading of said lumber upon barges, to be done by said Strother. All the lumber was to be well manufactured, of standard lengths and thickness, and so as to measure plump when dry for market. Strother was to load said lumber on barges in the Mississippi river near Caruthersville, Mo.

On the 25th day of January, 1902, Strother entered into another contract with the complainant whereby Strother sold and conveyed and agreed to deliver to the complainant, to stack and pile in the lumber yards of the complainant adjacent to the mill theretofore referred to, the entire cut and output of oak and ash lumber from certain sawmills owned and operated by Strother, known as the "Michael," "Cowskin," or "Lower" mill, sawed between January 1, 1902, and January 1, 1903, at the prices per thousand feet as scheduled in the contract. (Here are set out the different kinds of lumber at the various prices per thousand feet.) The title to this property is the same as in the first contract, and when placed in said yard was to vest in the complainant. It also contained a like agreement respecting the grading and measurement as delivered by said inspector, according to the rules of the National Hardwood Association, with a like provision as to the time and manner of payment, with the drawback of $2 per thousand feet for the purposes aforesaid. It was alternatively agreed in said contract that if the complainant desired any part of the lumber delivered to it, loaded on the cars of the St. Louis, Caruthersville & Memphis Railroad, Strother would do so in lieu of the delivery on barges in the Mississippi river. For the lumber so delivered to the railroad Strother should rebate $1.20 per thousand feet out of the $2, which it was agreed the complainant should retain to insure the hauling, loading, etc. Under this contract the average cut of lumber should not be less than 150,000 feet per month. The contract contained the same requirement as to the quality and measurement of said lumber.

On the 21st day of January, 1902, Strother and said company entered into another contract, by which Strother sold and agreed to deliver, to stack and pile in the lumber yard, as aforesaid, the entire cut and output of all oak, ash, and cottonwood lumber from the Eagle Lake Mill sawed between June, 1902, and June, 1903, at the prices per thousand feet for the different grades specified in the contract. The last-named contract contained the further provision that for the purpose of securing a suitable yard for storage and drying purposes, on the request of complainant, Strother would execute to it a lease of ground of suitable size and location near the mill, to begin at the date of the contract and end January 1, 1904. Whenever the lumber so cut by Strother was placed in said yard so to be established, the title thereto should vest in the complainant. It contained a like provision respecting the grading, measuring, and inspecting of the lumber, and a like provision respecting the time of payment and the rebate thereon contained in the first two named contracts. The average cut of lumber was not to be less than 150,000 feet per month, with a provision like the other contracts with regard to the standard length, thickness, and quality of the lumber when dry for market; to be loaded on barges in the Mississippi river near Caruthersville, Mo.

The bill alleges that the defendant Strother began to saw and deliver lumber under the first contract until January, 1902, under the contract with the

company as copartners, and afterwards until August 31st to the complainant corporation; that the several contracts aforesaid were being executed simultaneously, and deliveries of lumber under each of said contracts were made to the several general lumber yards of the complainant, no attempt being made to keep the output of each mill separately; that no account was kept by the complainant of the amount, quality, character, or value of the lumber delivered at the several yards adjacent to said mill; that each shipment, as received at the complainant's lumber yards at Cairo, Ill., from time to time, were intermixed with other lumber of the complainant's received from other and different mills, as well as with other shipments previously received from said Strother, so as to render it extremely difficult, tedious, and expensive, with endless labor, to determine the shortage in said lumber by taking account of the lumber received at the Cairo yards; that the complainant kept no account, and has no account of the quantity, character, or value of the lumber delivered to its several yards adjacent to said mills; and it does not know, and has no means of fully ascertaining or proving, the amount, quality, character, or value of the lumber delivered to it at the yards adjacent to said mills; that no account or inventory of the lumber received from Strother was taken or kept as the same was delivered, nor until long after the lumber was finally delivered at the yards at Cairo; when the complainant undertook to make such inventory it discovered that a shortage existed as to the lumber charged against it by Strother; that it had in the meantime been charged with and paid for large quantities of lumber alleged to have been delivered to it that in fact never were delivered to the complainant at any place; that the inspector appointed by the complainant and maintained at said several mills to grade and measure the same as delivered at the several lumber yards was induced by said Strother to make false and fraudulent reports and render false accounts of sale to the complainant and its predecessor for lumber sawed and delivered, which said reports or accounts of sales were approved on their face by the inspector, and were believed by the complainant and its predecessor to be correct; and, relying upon the accuracy and truthfulness of said reports, with the indorsed approval of the inspector, it paid to said Strother the amounts shown to be due by said reports and accounts, according to the provisions of the contract.

The bill alleges that the lumber was delivered daily and in various amounts under each of said contracts; that said fraudulent reports and accounts were rendered by said Strother every 15 days or oftener; that in all 45 reports or account sales for lumber sawed and delivered were made; that on all or nearly all of said reports or account sales the amount delivered was, with the knowledge, consent, and connivance of said Strother, overstated; that a less quantity of lumber than shown by said reports and accounts was delivered; that the quality or grade reported was not the quality or grade actually delivered, the reports and accounts showing much higher or more expensive grades than that delivered; that said Strother purposely and designedly induced and procured said inspector to be made and kept drunk with intoxicating liquor for long periods of time, and persuaded him to leave his post of duty, and to intrust the measuring and grading of said lumber to said Strother or his agents; that after having thus incapacitated the said inspector, or brought about his absence, the said Strother fraudulently either altered or changed the record of the grade and account of lumber already delivered, or procured the record of grade and count to be falsely kept as said lumber was delivered; that in a number of said reports Strother falsely increased the amount in quantity or grade of the lumber actually delivered to the yards adjacent to the mills, and fraudulently induced or misled the inspector into approvals, whereby the complainant was induced to overpay said Strother; that the complainant does not know, and has no means of fully proving, but Strother well knows, the extent, the dates, manner, and amounts of such overpayments and upon which of said contracts the complainant was so defrauded, and that he ought to be required to discover to the complainant said facts; that by reason of the fraudulent acts and conduct of the defendant, the complainant and its predecessor, between April, 1901, and August, 1902, did pay to said Strother for 5,022,526 feet of lumber

of the various kinds, qualities, and grades and divers lengths and thicknesses enumerated in the contract, when in fact there was actually delivered a very much smaller quantity, but just how much from each of said mills, or how much under each of said contracts, it cannot say, but on information and belief the amount it received fell short 622,526 feet; that by reason of the frauds and deceits aforesaid it overpaid said Strother on account of said first-named contracts about the sum of $16,000, in excess of what was justly due, which sum, in equity, he holds as trustee for the complainant, and should be required to account as such therefor; that the complainant paid said amounts at different times and dates, and in sundry and various smaller amounts, extending over a period of 17 months, upon different fraudulent accounts and reports; that said payments were on alleged deliveries made irrespective of and without distinction between the contracts under which, or the yards to which, such deliveries were alleged to have been made. How much of said shortage occurred under each contract, the complainant is unable to say exactly. The bill alleges that large quantities of the lumber were not sawed so as to measure plump and of the required thickness, so that it measured less than the required thickness, and had to be sold by the complainant as of the thickness and size smaller than as reported, and for a consequent decrease in price.

It is further alleged that on the 15th of September, 1902, it demanded of the defendant Strother that, according to contract, he execute to it a lease of the property theretofore set apart by him as a lumber yard adjacent to said Eagle Lake Mill; that he account to complainant for the overpayments made to him as aforesaid, because of the false and fraudulent reports and the diminished thickness of the lumber as reported, etc., which the defendant refused and failed to do; that afterwards said Strother wrongfully terminated the last two contracts hereinbefore referred to, and refused to perform the same, and excluded the complainant and its representatives from the property on which said mills were located, and from the lumber yards, nor did it permit the complainant or its representatives to further inspect, grade, or count the lumber thereafter manufactured, and that thereafter the defendant Strother appropriated to his own use the output of the several mills in said last two contracts described, notwithstanding by the terms of the contract such output was sold to the complainant, and in equity belonged to it; how much of said last-named lumber the defendant Strother disposed of it is unable to state, but on information and belief it is alleged to have aggregated 4,500,000 feet; that by reason of the raise in the value of lumber said lumber was worth at least $5 per thousand feet in excess of the price Strother was to receive therefor under the contract; that the aggregate amount would be $22,500, to which the complainant is justly entitled; that by reason of Strother's failure to deliver the lumber, and on account of the scarcity of such lumber in the market, it was compelled to supply its wants at an additional expense of $2,500.

It is further alleged that about the 19th day of September, 1902, after the defendant had wrongfully declared said contracts at an end, he entered upon the premises theretofore set apart for the complainant's use as lumber yards, where it had stacked and stored the manufactured lumber theretofore sold to it by Strother, and appropriated to his own use a large amount of said lumber, the extent of which is to the complainant unknown, but which it believes to be of the value of $10,000, which the defendant ought to be required to discover and account for to the complainant. It is then alleged that the defendant Strother failed to deliver to the St. Louis, etc., Railroad about 362,717 feet of lumber from its said yards, which, under a proper accounting, ought to go to the complainant, in the sum of $961.03.

Under the third contract the complainant requested said Strother to deliver on barges in the Mississippi river 305,778 feet of said lumber from its yards, to the complainant's injury in the sum of $441.09, which the defendant should be required to account for.

In the fourteenth paragraph of the bill it is alleged that the defendant Shepard was and is interested with said Strother as a secret partner in said transactions, and that he has received and taken part of the profits realized

by the fraudulent and wrongful acts of said Strother above set forth, but what is the extent of such interest, or how much said Shepard has realized therefrom, the complainant is unable to state, but it is believed on information that it is about $7,500. That he took said sum with full knowledge and information of the frauds aforesaid of said Strother, and that he should be held and decreed to be a trustee for the use and benefit of the complainant to the extent of the sum so received by him.

The fifteenth paragraph of the bill is important, and is as follows:

"Your orator shows to the court that the details concerning the several matters herein complained of, to wit, the extent to which the numerous reports and accounts sale hereinbefore referred to were altered, raised, and increased in quantity and value over the actual lumber delivered to the complainant, and the extent of complainant's damage thereby, the quantity, quality, and value of the complainant's manufactured lumber which defendant Strother wrongfully took into his possession and appropriated to his own use, the quantity, quality, and value of the lumber manufactured and sold by defendant Strother after his wrongful repudiation of the contracts of sale to complainant and the amount actually realized therefrom by defendant Strother are known to defendant Strother, and are also known (according to the best knowledge and belief of complainant) to the defendant Shepard, and complainant is unable to prove, or so fully prove, these facts by other evidence and the facts concerning these matters cannot be proven or so fully by the ordinary forms of procedure at law, and your orator alleges on information and belief that the defendants kept or caused to be kept full accounts of the amounts of which your orator was defrauded as aforesaid, during the continuance of said contracts, of the profits realized from the sale of the lumber equitably the property of your orator after the wrongful repudiation of said contracts, and still have such accounts unless the same have been destroyed, and they and each of them ought to be required to discover and disclose the same to your orator."

The sixteenth paragraph alleges that the money so wrongfully obtained from the complainant, and the proceeds of the lumber of the complainant so wrongfully appropriated by the defendants, have been invested in certain real estate and personal property in Pemiscot county, Mo., or in counties adjacent thereto, or both; that in just what proportion such funds have been invested is unknown to the complainant; that defendants ought to be required to discover and disclose in what property such funds have been invested, in order that the complainant may be decreed a lien thereon to the extent to which its funds contributed to the purchase thereof, and in order that the defendants may be decreed to hold the same in trust for the complainant until the amount of its funds so invested therein be refunded.

The final allegation is that the acts complained of are contrary to equity, and that the complainant is without adequate remedy at law, because it has no record or account sufficiently full to prove either the extent, manner, or date of the several frauds committed by the defendants, who have full and accurate information thereof; nor can it so amply prove upon which of the several contracts it was defrauded as aforesaid as it may be able to show in equity, because of the full and exact information possessed by the defendants.

The prayer of the bill is that defendants be required to make full and true discovery and disclosure concerning the transactions and matters aforesaid; that they be decreed to account to the complainant with respect thereto; that an account be taken, under the direction of the court, of all dealings, transactions, etc., complained of; and for a decree for the balance ascertained, etc.

James C. Jones and George H. Peaks (Gann, Peaks & Haffenberg and Jones, Jones & Hocker, on the brief), for appellant.

Charles B. Williams (R. P. Williams, on the brief), for appellees.

Before SANBORN, Circuit Judge, and PHILIPS and RINER, District Judges.

PHILIPS, District Judge, after stating the case as above, delivered the opinion of the court.

The principal objections urged against the bill of complaint are: (1) That the complainant has an adequate remedy at law as for damages on breaches of the contracts. (2) That the case made on the face of the bill does not present the adjusting of mutual accounts between the parties. On the contrary, it presents nothing more than demands upon the defendant Strother to account to the complainant for what in law it was entitled to receive under the several contracts if kept and performed by Strother. And (3) that, notwithstanding the bill asks for a discovery from the defendant, and for relief, such a bill of discovery, if not obsolete, is not sufficient to justify a resort to equity in the jurisdiction of Missouri, where, under the Code, the defendant can be called upon to produce his books and papers for inspection, and where the defendant can be examined by the adversary on depositions taken de bene esse or ore tenus at the trial.

Taking up these objections in the inverse order, we hold that the office of a bill for discovery and relief, and the right to invoke it, exist in the federal jurisdiction, notwithstanding the criticisms made upon its exercise. In Kelley v. Boettcher, 85 Fed. 56–66, 29 C. C. A. 14, Sanborn, J., said:

"It is true that the federal and state statutes now in force which enable the complainant to obtain such an examination have greatly diminished the need of these discoveries; but it is none the less true that these statutes have neither abrogated the right nor curtailed the power of courts of equity to enforce them. They have only added another right to that which had already been secured in courts of chancery. Every bill for relief exhibited in a court of equity is, in effect, a bill for discovery, because it asks or may ask from the defendant an answer upon oath relative to the matters which it charges. The power to enforce such a discovery is one of the original and inherent powers of a court of chancery, and the right of a party to invoke its exercise is enjoyed in every case in which he is entitled to come into a court to assert an equitable right or title, or to apply an equitable remedy."

See, also, Ryder et al. v. Bateman et al. (C. C.) 93 Fed. 31; Indianapolis Gas Company v. City of Indianapolis (C. C.) 90 Fed. 196; Brown v. McDonald (C. C. A.) 133 Fed. 898.

That bills for discovery and relief inhered in the ancient jurisdiction of courts of chancery in England at the time of the adoption of the federal judiciary act is beyond question. This being so, the like jurisdiction inheres in the federal courts, unless abolished by statutes, changed or modified by some rule adopted by the Supreme Court. No such statute has been passed, and, so far from the Supreme Court having interdicted the practice, the rules in equity 40, 41, and 44, expressly recognize the existence of bills for discovery. The discussion of this question by Pomeroy (section 230, Pomeroy's Equity) may be regarded as matter of argument against the propriety of courts of equity indulging with too free a hand a resort to the remedy, rather than an authoritative statement of positive law, in so far as the federal courts are concerned.

The bill of complaint discloses an embarrassing state of affairs respecting the relative attitude of the litigants. For its safeguard and proper protection against mistakes, negligence, fraud, and deceit, al–

ways possible under such contracts by the party who is to make the delivery, the parties living in different states, the lumber company stipulated in the contracts for the presence at the place of preparation, grading, and delivery of the lumber of its own representative to make inspections, who would keep tally and memoranda. Under this condition the absent company would not have to rely upon the accuracy, carefulness, or honesty of the defendant Strother, or on matters of information and evidence especially in his keeping. But when by trick, cozening, or other improper means Strother displaced, or subjected to his service, the trusted agent of the complainant, he thereby locked within his own breast and keeping much of the essential evidence which the company sought to preserve on its own behalf by the contracts. This essential information pertained to matters of infinite detail, personal observation and notation connected with the quality, quantity, assortment, and measurement of millions of feet of lumber of different sizes, lengths, and grades; transactions extending over long periods of time. After Strother had ousted, or subjected to his will, the complainant's agent, the means of obtaining approximate, reliable information aliunde was minimized by the fraud of the defendant. Under such a state of facts, the utmost powers of a court of equity should be invoked to search out the conscience of such a wrongdoer. Equity possesses no more plenary or effective method than by compelling such a party to purge his conscience by uncovering to his victim the information in his breast and keeping. Equity gives the wronged party this right at the very opening of the legal altercations, to enable him to prepare his case for hearing, and to open up to him, possibly, other avenues of information.

In a case situated as this, we are unable to assent to the proposition, so stoutly asserted by counsel for appellees, that a court of equity cannot primarily take jurisdiction to compel an accounting by the derelict party because there are no mutual debits and credits between the parties of such prolix or complicated character as to invite the aid of a master in chancery. No hard and fast rule can be laid down as to the exact conditions on which a court of equity will take jurisdiction. Its powers are supposed to be plenary for measurably securing the ends of justice. Its protective and corrective power will be exerted or withheld, according to the exigencies of the particular case presented. While the primary idea of account—computatio—implies matters of debit and credit, the adjustment of which will show a balance to be accounted for by the one party or the other, "it is not necessarily restricted to several distinct items, nor is it the less an account that all the items of charge are by one person against another, instead of being a statement of mutual demands of debit and credit, provided the charges arise out of contract, express or implied, or from some duty imposed by law." 1 Enc. of L. and P. 362; Nelson v. Posey County, 105 Ind. 287, 4 N. E. 703. At common law it was the means by "which certain persons who were under some legal duty to account for property or money of another were compelled to render such account"; especially so where the plaintiff demanded an account, and could not give evidence of his right without it. 3 Reeves, Hist. Eng. 1, 277; Field v. Brown, 146 Ind. 293, 45 N. E. 464; 1 Cyc. of L. & P. 401. Indeed,

the very condition on which a court of equity takes jurisdiction for the adjustment of mutual accounts is the presence of the fact of their intricacy and complications. It should therefore logically follow, where the intricacy and complication exist, the mere singleness of the accounting should not be controlling. State of Arkansas v. Churchill, 48 Ark. 426, 3 S. W. 352, 880. Moreover, the want of mutuality can present no barrier where a discovery lies and relief is asked thereon. Gloninger v. Hazard, 42 Pa. 389. Nor should it present any obstacle to a resort to equity where, from the peculiarly complicated transactions, a trial to a jury at law would, in all reasonable probability, fall far short of the remedial adequacy of a proceeding in equity. While judges of state courts have expressed reluctance to entertain equity jurisdiction in such conditions of an accounting, it will generally be found that they parry the force of the argument of the practical unfitness of the average jury to deal with such matters by recourse to the provision of the state Code, which in an action at law authorizes the court, in its discretion, to send the matter to a referee. A striking illustration of this is furnished in the opinion of Peckham, J., in Uhlman v. New York Life Insurance Company, 109 N. Y. 433, 17 N. E. 363, 4 Am. St. Rep. 482. As the federal courts in law actions are not invested with the discretionary power of making such references (Gunn v. Brinkley, etc., Company, 66 Fed. 382, 13 C. C. A. 531), there ought not to be any question of the right to resort to the equity jurisdiction of the federal courts when the facts present such a condition of an accounting as would authorize a court of law to send the case to a referee. In Root v. Railway Company, 105 U. S. 189, 26 L. Ed. 975, the Supreme Court, in discussing a bill in equity for a naked account of profits and demands against an infringer of a patent, said:

"Such an equity may arise out of, and inhere in, the nature of the account itself, springing from special and peculiar circumstances which disable the patentee from a recovery at law altogether, or render his remedy in a legal tribunal difficult, inadequate, and incomplete; and, as such cases cannot be defined more exactly, each must rest upon its own particular circumstances, as furnishing a clear and satisfactory ground of exception from the general rule."

In Kirby v. Railroad Company, 120 U. S. 130, 7 Sup. Ct. 430, 30 L. Ed. 569, the court said:

"The complicated nature of the accounts between the parties constitutes itself a sufficient ground for going into equity. It would have been difficult, if not impossible, for a jury to unravel the numerous transactions involved in the settlements between the parties, and reach a satisfactory conclusion as to the amount of drawbacks to which Alexander & Co. were entitled on each settlement. Justice could not be done except by employing the methods of investigation peculiar to courts of equity."

In Gunn v. Brinkley, supra, it is true the court was discussing the question of mutual accounts, but the language and the sense are just as applicable to the case at bar. The court said:

"According to this bill there is here a mutual running account that extends over a period of more than six years; it involves more than 500 items; it has been complicated and confused by the fraudulent entries and omissions of a faithless trustee; and, in our opinion, it would be next to impossible for a jury to carefully examine this account and reach a just result. That can

only be done by a reference to a master or a hearing before a chancellor in the method peculiar to a court of equity."

Again, in Hayden v. Thompson, 71 Fed. 60–64, 17 C. C. A. 592, 595, this court said:

"These long and complicated accounts can be properly taken and stated, and the just deductions can be drawn from them only in a court in which a careful, patient, and extended examination of all the evidence can be made after it is submitted by a mind trained in the science of accounting and familiar with the law which governs it."

What are the matters presented by this bill which a jury in an action at law would have submitted to them? The accounting demanded of the defendant Strother involves the examination of 45 reports, made at different periods, to the complainant, each pertaining to eight kinds of lumber, covering 360 items, aggregating over 5,000,000 feet. The jury would be called upon to ascertain and determine which one, and how many, of these were affected with fraud, whether in respect of quantity, quality, or grading, and measurement, and under which particular contract. It would involve the investigation and ascertainment of the amount of loss resulting to the complainant by reason of Strother's failure to manufacture according to each contract, and the amount of each kind of lumber delivered. This would necessitate a finding as to the market value of that delivered as to the several items, and the deduction of the contract price; the making of proper receipts and balances as a basis for calculating interest thereon. The same process would measurably have to be gone through in ascertaining the loss, if any, consequent upon the failure to execute the lease; to ascertain the amount to be charged to the defendant by reason of having converted to his own use the lumber in the yards alleged in the bill, which would involve a finding of the amount of lumber in the yards converted by said defendant, what amount of this had been paid for and the amount not paid for; and the profits, if any, made on the whole, and the like. It would involve the ascertainment of the amount which the complainant should have on account of the failure of the defendant, after the termination of the contract, to continue deliveries up to the time limited in the contracts. The facts to be found and results to be worked out on such an issue would especially involve matters little suited to the qualification of jurors.

The whole matter is especially complicated by the fact that there are three separate contracts, with somewhat varying provisions, which were being simultaneously executed, or claimed to have been so by the complainant, with no separate accounts kept as to each, and when the extent of the deficiencies may have been greater under one than the other. How could such involved issues, requiring close analysis, intelligent separations, discriminations, and calculations, be made with even approximate accuracy by the average jury? How would it be possible for a jury, through a protracted, tedious hearing, to carry such infinite details in their minds, and work out such problems in the wranglings of the jury room? That any result, under such conditions, reached by a jury, no matter how

intelligent or honest, would necessarily be something of guesswork, does not admit of debate. That such an accounting should be referred to a master in chancery to patiently hear, in order to work out the complex and intricate sums with deliberation, and without confusing interruption, appeals to the highest sense of justice. Indeed, the conscientious judge who should sit in the trial of such a case to a jury would feel impelled, in assisting the jury to a just result, to quite nigh perform the part of a chancellor in reviewing and analyzing the many details of the evidence, and to give the result to the jury. Under the conditions that would inevitably attend such a trial the judge's own review and analysis could be but superficial, and probably incorrect.

Such a case as this presents an apt illustration of the reasons which have impelled the Justices of the Supreme Court time and again, when counsel opposing a resort to the equity side of the court have appealed to the provision of the judiciary act that "suits in equity shall not be sustained in any case where a plain, adequate, and complete remedy may be had at law" (Act Sept. 24, 1789, c. 20, § 16, 1 Stat. 82 [U. S. Comp. St. 1901, p. 583]), to say that the adequate remedy at law must be "as practical and efficient to the ends of justice and its prompt administration as the remedy in equity" to exclude the equitable jurisdiction.

It is to be conceded that as to some of the breaches of the contracts complained of, they could well be tried to a jury in an action at law. But this fact does not oust the jurisdiction in equity. The matters complained of inhere in and grow out of the same contracts and their violation on which the jurisdiction in equity is specially based, and the remedy sought is to have the derelict render an account and satisfaction. Where a court of equity thus obtains jurisdiction over any material part of the subject-matter in controversy between the parties, it brings within the compass of its jurisdiction in the single proceeding the entire adjustment of all, to put an end to the litigation. Pomeroy's Equity, vol. 1, pars. 181–242; 1 Cyc. of L. & P. 418.

There is another ground of equitable jurisdiction presented in the bill that is unquestionable. It is alleged that the moneys wrongfully withheld by the defendants in equity belong to the complainant, and that the defendants, in effect, had surreptitiously invested the funds in real estate and personal property. This being so, the complainant has the right to follow the funds into any property into which it has been converted. Equity converts the holders of the legal title into constructive trustees for the benefit of the equitable owner, and accords to the complainant the option either to take the trust property absolutely, or to enforce against it a lien to the extent of the amount so converted. Broom Mfg. Co. v. Guymon, 115 Fed. 112, 53 C. C. A. 16; Piatt v. Oliver, Fed. Cas. No. 11,116; Docker v. Somes, 2 Mylne & K. 665; Angle v. C. & P. Ry. Co., 151 U. S. 1–25, 14 Sup. Ct. 240, 38 L. Ed. 55; Bresnihan v. Sheehan, 125 Mass. 11; Sanford v. Hammer, 115 Ala. 406, 22 South. 117; Perry on Trusts (5th Ed.) § 166.

· The objection that the bill is rendered multifarious by bringing the defendant Shepard into the controversy in order to reach said trust property, is not sustainable. It is not essential that all the parties to a suit in equity should be directly interested in all matters involved in the bill. Multifariousness is avoided if each of the parties is concerned in matters material, provided they are allied to or connected with the others. So where some defendant may be a necessary party to some essential portion of the relief sought growing out of the entire controversy, the objection of multifariousness will not obtain. Barcus v. Gates, 89 Fed. 783, 32 C. C. A. 337; Brown v. Guarantee Trust Co., 128 U. S. 403–412, 9 Sup. Ct. 127, 32 L. Ed. 468; Kelley v. Boettcher, 85 Fed. 64, 29 C. C. A. 14; Curran v. Campion, 85 Fed. 70, 29 C. C. A. 26; Weir et al. v. Gas Co. (C. C.) 91 Fed. 940.

The decree of the Circuit Court is reversed, and the cause is remanded, with directions to set aside the decree sustaining the demurrer and to overrule the demurrer.